## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTOWAN HAGANS,<br>1901 D St SE<br>Washington, DC 20003<br><br>       Plaintiff-Petitioner,<br>       *Individually and on behalf of*<br>       *all other similarly situated*<br><br>       v.<br><br>UNITED STATES PAROLE<br>COMMISSION,<br>90 K Street NE, 3rd Floor<br>Washington, DC 20530<br><br>PATRICIA K. CUSHWA, *in her official*<br>*capacity as Acting Chairman of the United*<br>*States Parole Commission*<br>90 K Street NE, 3rd Floor<br>Washington, DC 20530<br><br>PAMELA BONDI, *in her official capacity*<br>*as Attorney General of the United States*<br>U.S. Department of Justice<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530<br><br>JOE PAGE III, *in his official*<br>*capacity as Warden of the D.C. Jail*<br>1901 D St SE<br>Washington, DC 20003<br><br>       Defendants-Respondents. | Case No. 25-cv-1671 |

## CLASS ACTION COMPLAINT FOR HABEAS AND INJUNCTIVE RELIEF

    Plaintiff Antowan Hagans, on behalf of a class of similarly situated individuals on

supervised release for D.C. Code offenses, alleges as follows:

## PRELIMINARY STATEMENT

Mr. Antowan Hagans was arrested in March of this year for unlawful possession of a firearm. After reviewing the Body Worn Camera ("BWC") footage and hearing the government's arguments, the Magistrate Judge determined that the weight of the evidence supported Mr. Hagans' release from detention pending trial. A District Court Judge upheld that determination. And a third Judge assigned to Mr. Hagans' federal probation also agreed he should not be jailed pending a probation revocation hearing. Yet Mr. Hagans is nonetheless incarcerated in the D.C. Jail, where he is separated from his family and experiences dangerously unsanitary conditions, even though he has not been adjudicated responsible for any wrongdoing.

The source of Mr. Hagans' continued incarceration—contrary to the decision of three federal judges—is the United States Parole Commission ("Commission" or "Parole Commission"), which administers supervised release for D.C. Code offenses. Mr. Hagans is on supervised release stemming from a ten-year-old robbery case in D.C. Superior Court. Unlike the judges who ordered Mr. Hagans' release, the Commission did not base its detention decision on any individualized determination about the allegations against Mr. Hagans or his personal circumstances.

Mr. Hagans is not alone. Unlike other forms of supervision, where judges can and do release individuals pending revocation proceedings, the United States Parole Commission does not release anyone pending revocation hearings—regardless of the merits of the case or other circumstances. Instead, the Parole Commission jails every person who is awaiting a revocation hearing without considering the seriousness of the alleged violation, the likelihood of returning for the final hearing, or whether the person poses a public safety risk.

This automatic detention policy is unlawful for several reasons. First, the Non-Detention

Act precludes the Commission from jailing anyone before revoking their supervised release. Second, the Commission's automatic detention policy violates the United States Constitution's Due Process and Equal Protection guarantees because it provides no procedural protections to prevent erroneous detention, lacks a legitimate justification, and results in disparate treatment among similarly situated groups with no rational basis. And finally, the statute governing the Commission's revocation procedures explicitly directs the Commission to consider several enumerated factors in determining whether to jail someone pending their revocation hearing. The Commission acts unlawfully when it fails to consider any of these factors and has instead instituted an automatic detention policy.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, because it presents a federal question under both the United States Constitution and federal laws.

2. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants are located in this judicial district, Plaintiff is incarcerated in this district, and Plaintiff's claims for relief arose in this district.

## PARTIES

3. Plaintiff Antowan Hagans is a 30-year-old Black man on supervised release in Washington, D.C. who is currently being incarcerated at the D.C. Jail by the United States Parole Commission pending a revocation hearing.

4. Defendant United States Parole Commission is the federal agency responsible for the administration of parole and supervised release in Washington, D.C., including decisions regarding the continuation, termination, and revocation of their supervision.

5.     Defendant Patricia K. Cushwa is sued in her official capacity as Acting Chairman of the United States Parole Commission. In this capacity, Defendant Cushwa oversees the operations of the United States Parole Commission.

6.     Defendant Pamela Bondi is sued in her official capacity as the Attorney General of the United States.

7.     Defendant Joe Page III, Plaintiff's immediate custodian, is the Warden of the D.C. Jail, where Plaintiff is incarcerated, and is being sued in his official capacity.

## BACKGROUND

### *Supervised Release Was Created to "Ease the Defendant's Transition Into the Community"*

8.     Supervised release was established in the federal system in 1984, when "Congress overhauled federal sentencing procedures to make prison terms more determinate and abolish the practice of parole." *United States v. Haymond*, 588 U.S. 634, 651 (2019).

9.     Supervised release was created to be fundamentally different from other forms of community supervision in existence. Structurally, parole and probation are two other means by which an individual can serve a portion of their sentence in the community. Dissimilarly, "supervised release wasn't introduced to replace a portion of the defendant's prison term, only to encourage rehabilitation after the completion of his prison term." *Haymond*, 588 U.S. at 652 (cleaned up). In other words, while parole and probation are part of "the term of imprisonment," supervised release is "a separate part of the defendant's sentence." S. Rep. No. 98-225, at 123 (1983).

10.     This structural difference entails meaningful consequences. As supervised release is not part of the term of imprisonment, its primary goal cannot be punishment or retribution. Rather, it was created "to ease the defendant's transition into the community" following a prison

term. *Id.* at 124–25. Supervised release thus "may not be imposed for purposes of punishment or incapacitation since those purposes will have been served to the extent necessary by the term of imprisonment." *Id.* at 125.

11.     Given this purpose, Congress did not initially provide for revocation for a violation of a condition of supervised release "because it does not believe that a minor violation of a condition of supervised release should result in resentencing of the defendant." S. Rep. No. 98-225, at 125 (1983). Instead, courts could modify the conditions of release in response to violations or initiate contempt proceedings for more serious and repeated violations. *Id.* at 133.

12.     Ultimately, before these policy changes were implemented, Congress added a revocation mechanism via a "technical amendment" to a statute creating mandatory minimum penalties for drug-related offenses. Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1006, 100 Stat. 3207. Despite this last-minute addition, the core function and purpose of supervised release remained distinct from its predecessors in community supervision. While parole and probation are part of a sentence imposed as punishment for a criminal offense, "[s]upervised release fulfills rehabilitative ends, distinct from those served by incarceration," *United States v. Johnson*, 529 U.S. 53, 59 (2000).

### In Washington, D.C., a Federal Agency Has Authority Over Individuals on Supervised Release

13.     Thirteen years later, Congress "borrowed and incorporated" this system of supervised release into the D.C. Code. *See* Report of the District of Columbia Advisory Commission on Sentencing, at 19 (Apr. 5, 2000). Through the Revitalization Act of 1997 and the Sentencing Reform Amendment Act of 2000, Congress abolished parole in the District and replaced it with supervised release for people convicted of D.C. Code offenses in D.C. Superior Court.

14.    Like its federal counterpart, supervised release in Washington, D.C. had "significant differences" from parole, as the "purpose[] of supervised release" is "rehabilitation and reintegration into the community rather than further punishment or incapacitation." *Id.* at 16.

15.    In the federal system, revocation decisions for both supervised release and probation must be made by a judge. *See* 18 U.S.C. § 3583(e)(3) ("The court may . . . revoke a term of supervised release."); Fed. R. Crim. P 32.1(b)(2) ("the court must hold the revocation hearing"). Courts have recognized that "a nonjudicial officer may not decide the nature or extent of the punishment" imposed on either someone on probation or supervised release, because "under our constitutional system the right to . . . impose the punishment provided by law is judicial." *United States v. Nishida*, 53 F.4th 1144, 1150 (9th Cir. 2022) (cleaned up).

16.    But in Washington, D.C., through the Revitalization Act, Congress delegated authority over people on supervised release—including decisions regarding revocation—to a federal agency: the United States Parole Commission. D.C. Code § 24-133(c)(2) (providing that supervised releasees are "subject to the authority of the United States Parole Commission until completion of the term of supervised release").

17.    Prior to this delegation of authority, and with federal parole eliminated, the Commission was slated to be abolished by 1992 pursuant to the Comprehensive Crime Control Act of 1984. But with the passage of the Revitalization Act, the Commission had an entirely new population to monitor: people in D.C. on supervised release.

18.    According to the Commission, this expanded authority reinvigorated the agency whose purview was dwindling given the abolishment of parole. "This [new authority and caseload] represented a dramatic shift—instead of overseeing a dwindling population of old-law offenders— the Parole Commission was now overseeing a dynamic and replenishing population of local

offenders." U.S. Parole Commission Congressional Report FY 2022 at 2. With this expanded role, the Commission's authorization has now been extended many times, most recently in the Continuing Appropriations and Extensions Act of 2025, Pub. L. 118-83, 138 Stat. 1524.

19.    Today, this federal agency exists almost exclusively to supervise and reincarcerate people in Washington, D.C. In 2022, for example, the Commission's caseload included 53 individuals on federal parole, compared to 1695 people on supervised release for D.C. Code offenses. U.S. Parole Commission Congressional Report FY 2022 at 6.

### *The Liberty Interests of Individuals on Supervised Release are Significant*

20.    The bulk of the Commission's work today involves revocation proceedings for people on supervised release in Washington, D.C. In 2022, for example, the Commission conducted 474 probable cause hearings and 288 revocation hearings for people on supervised release. U.S. Parole Commission Congressional Report FY 2022 at 11.

21.    When an individual on supervised release for a D.C. Code offense is accused of violating a condition of supervised release, the Commission arrests the individual and initiates revocation proceedings.

22.    These proceedings can be prompted by either alleged criminal conduct or administrative violations of conditions of release—known as "technical violations." Technical violations occur where someone fails to comply with a condition of supervision, such as missing an appointment with a supervision officer, being unable to get a job, missing a drug test, associating with someone with a felony conviction, or failing to attend a required program. They are considered "technical" because they are not violations of criminal law, but rather of the administrative terms of supervision.

23.     Revocation proceedings begin with a probable cause hearing,[1] after which the Commission can decide to schedule a final revocation hearing. At a revocation hearing, which is held in a room at the D.C. Jail, a hearing examiner for the Commission decides whether to recommend that an individual's supervised release be revoked and a term of imprisonment imposed. *See* 28 C.F.R. § 2.216. A Commissioner reviews this written recommendation and makes a final determination regarding revocation and sentencing. *Id.*

24.     The liberty interests during these revocation proceedings are great.

25.     Before supervised release was created, the Supreme Court recognized the due process rights implicated when someone on probation or parole faces revocation: "[T]he whole thrust of the probation-parole movement is to keep men in the community, working with adjustment problems there, and using revocation only as a last resort when treatment has failed or is about to fail." *Gagnon v. Scarpelli*, 411 U.S. 778, 785 (1973).

26.     These rights are even greater as to someone on supervised release, who is no longer serving a sentence and who is on supervision in order "to ease [his] transition into the community" following a prison term. S. Rep. No. 98-225, at 124 (1983).

27.     However, even before the Commission determines at a revocation hearing that an individual has violated their conditions of supervision and that a prison term will be imposed, the Commission jails them for at least two months as they await their revocation hearing at the D.C. Jail.

28.     This pre-hearing detention is automatic. In fact, the Commission jails every single person on supervised release who is pending a revocation hearing. And this automatic detention

---

[1] An exception to this general process exists in a small number of cases where an individual is convicted of a new crime before revocation proceedings begin. When this happens, the revocation hearings may occur at the prison at a later date while the individual is serving a sentence.

applies to all cases, regardless of how minor the allegations are, or whether the sole charges are technical violations of supervision. It is even true where, as in named Plaintiff Mr. Hagans' case, the basis of the revocation proceeding is a new criminal case in which a judge found pre-trial release—not detention—appropriate.

29.    The Commission holds revocation hearings frequently and thus routinely employs its automatic detention policy. In 2022, for example, the Commission held 288 revocation hearings for people on supervised release. U.S. Parole Commission Congressional Report FY 2022 at 11.

### The Commission's Automatic Detention Policy is an Anomaly

30.    For those on other forms of supervision who are similarly situated to class members—people on federal probation or supervised release, and people on probation in Washington, D.C.—the availability of release pending a revocation hearing is the norm.[2]

31.    Individuals on probation for D.C. Code offenses are not supervised by the Parole Commission, but rather by the D.C. Superior Court. An individual in D.C. facing probation revocation proceedings is entitled to release pending their revocation hearing under D.C. Rule of Criminal Procedure 32.1, which provides that a court in D.C. "may release or detain the person under D.C. Code § 23-1325(b)," the law governing release pending sentencing. *See also Richardson v. United* States, 927 A.2d 1137, 1144 n.13 (D.C. 2007) (noting that a court may issue "a warrant *or summons* for violation of the conditions of probation") (emphasis added). Judges in

---

[2] There are four relevant categories of supervision: (1) probation for federal offenses, which is administered by district courts; (2) supervised release for federal offenses, which is administered by district courts; (3) probation for D.C. Code offenses, which is administered by the D.C. Superior Court; and (4) supervised release for D.C. Code Offenses, which is administered by the U.S. Parole Commission. The type of supervision someone is subject to depends on the court in which they are sentenced, and the type of sentence given. A court—either a federal court or the D.C. Superior Court—can sentence an individual to probation in lieu of time in prison, while a period of supervised release necessarily follows a term of incarceration.

D.C. Superior Court make individualized determinations before detaining individuals in the D.C. Jail pending a probation revocation hearing.

32.     This entitlement to pre-hearing release extends to juvenile court as well, where probation revocation proceedings "must be treated as if it were a pretrial detention matter," and a court thus must contain a "detailed statement of [] reasons for detention" pending the revocation hearing. *In the Matter of B.P.*, 397 A.2d 974 (D.C. 1979).

33.     In federal court, pre-hearing release is available in both supervised release and probation revocation cases. Federal Rule of Criminal Procedure 32.1 provides that when faced with probation or supervised release revocation, a judge "may release or detain the person under 18 U.S.C. § 3143(a)(1)," which is the Bail Reform Act law governing release pending sentencing.

34.     Courts have widely recognized that individuals are "entitled to pursue release after his initial arrest" when facing revocation of either supervised release or probation. *United States v. Stubbs*, No. 18-CR-6093-MAV, 2025 WL 1094293, at *4 (W.D.N.Y. Apr. 11, 2025). Where an individual "moves for bail pending his or her revocation hearing, the district court shall determine the person's eligibility for release under the standards of release set forth in 18 U.S.C. § 3143." *United States v. Loya*, 23 F.3d 1529, 1531 (9th Cir. 1994).

35.     The relevant statute and regulations contemplate a similar pre-hearing release for class members—people on supervised release for D.C. Code offenses who are facing revocation. 28 C.F.R. § 2.200 and D.C. Code § 24-133(c)(2) provide that, with respect to people on supervised release, the Commission shall follow the procedures "set forth with respect to offenders on federal parole" at 18 U.S.C. §4209 through 4215. These procedures include pre-hearing release where the Commission finds "incarceration . . . pending further revocation proceedings is not warranted by the alleged frequency or seriousness of such violation or violations," and the individual is not a

flight risk or a danger. 18 U.S.C. § 4214. The Commission's own Manual echoes this language as well. *See* U.S. Parole Commission Rules & Procedures Manual § 2.211-02.

36.     Within the last ten years, the Commission—like the federal and D.C. Courts overseeing revocation proceedings—recognized the liberty interests implicated by prolonged detention pending a revocation hearing and granted pre-hearing release.

37.     Rather than issue arrest warrants in every case it wanted to pursue, the Commission sometimes issued a "Notice of Appearance" (NTA) that required someone to appear for a revocation hearing in the community, at 300 Indiana Avenue NW, rather than be jailed pending their revocation hearing.

38.     NTAs were utilized in cases involving both technical violations of supervised release and alleged criminal conduct.

39.     Even when the Commission did issue an arrest warrant, individuals could request that they be added to the NTA docket and be released following a probable cause hearing and pending their revocation hearing.

40.     However, for people on supervised release in Washington, D.C., this procedural protection was unceremoniously abandoned several years ago.

41.     This change in practice was not due to any modification of the laws or regulations, or any reduction in the enormous liberty interests at stake. Instead, these procedural protections ended after the Commission no longer had access to a room located at 300 Indiana Avenue in which to conduct revocation hearings outside of the D.C. Jail.

42.     Rather than find a new location to hold revocation hearings in the community, the Commission decided in one fell swoop to jail everyone pending revocation at the D.C. Jail, where they are in close proximity to the room in the D.C. jail where the revocation hearings take place.

11

43.    Other than detention from the very outset, there is no procedure by which a person who is the subject of a revocation hearing can enter the D.C. Jail for the hearing. In other words, by the Parole Commission's own design, being incarcerated pending a revocation hearing is now a prerequisite for having a revocation hearing at all.

### *Automatic Pre-Revocation Detention Causes Devastating Harm*

44.    The Commission has jailed all class members without any individualized determination of whether detention is necessary or supported by the statutory factors.

45.    This detention has significant repercussions. The Commission has 65 days from the time of arrest to hold a revocation hearing. *See* 28 C.F.R. § 2.215(f). But people are often detained for even longer. For those facing criminal charges, for example, the revocation hearing often trails the trial, which "invariably delays such a hearing by more than 65 days." *Davis v. United States Parole Comm'n*, 20-cv-2897, 2021 WL 578820, at *5 (D.D.C. Dec. 3, 2021) (quoting Stephen Husk Decl.).

46.    Such individuals could remain detained at the D.C. Jail for months, or years, as they await trial[3]—even where the judge overseeing the criminal trial has ordered their release pending trial.

47.    Detention at the jail for even short periods is harmful. "Because a new period of incarceration, even if only 24 hours in length, may cost [someone on supervision] his employment, and further jeopardize his chances for rehabilitation, the detention of an alleged violator is a serious matter and must be dealt with in a manner which clearly recognizes the degree of loss to be

---

[3] As of April 2022, men held pretrial with felony charges spent an average of 13 months (390 days) incarcerated, while women held pretrial with felony charges spent an average of over eight months (257 days) incarcerated. Emilia Calma & Yesim Sayin, *Processing through D.C.'s criminal justice system: Agencies, roles, and jurisdiction*, D.C. Policy Center (Mar. 2, 2023).

suffered." S. Rep. No. 369, 94th Cong., 1st Sess. (1975), U.S. Code Cong. & Admin. News 1976, p. 339.

48.     People who are incarcerated pretrial can experience worsening mental illness, since conditions in jail can put a person under extreme stress and restrict access to needed medications[4]; a high likelihood of being assaulted, including sexual assault, especially in the first few days of incarceration; exposure to communicable diseases; inability to exercise; deprivation of sunlight and fresh air; and forcible separation from children and family.

49.     By being incarcerated, people undergo numerous external consequences as well, including loss of income (people often lose their jobs while detained); loss of housing and missed payments on utilities and other bills (people cannot make rent and other payments when jailed); and loss of physical or legal custody of their children (children of incarcerated parents regularly end up in the dependency system due to no caregiver being available outside of jail).[5]

50.     The D.C. Jail, in particular, is notorious for its harmful conditions. A federal class action lawsuit was recently filed against D.C. for failing to provide constitutionally adequate medical care to people in the D.C. Jail. *See V.C. et al., v. District of Columbia*, No. 23-cv-01139 (D.D.C.).

51.     And for people like Mr. Hagans who have been ordered released pending trial, their Commission-ordered detention undermines the trial court's decision that they should be able to fight their case outside of jail, subjecting them to higher rates of conviction and worse sentencing outcomes.

---

[4] *Incarceration's Front Door: The Misuse of Jails in America*, Vera Institute of Justice, at 12 (July 29, 2015).

[5] Sam McCann, *How "Collateral Consequences" Keep People Trapped in the Legal System*, Vera Institute of Justice (Nov. 29, 2023).

52.     People jailed on alleged supervised release violations have a more difficult time communicating with their counsel, making it harder to prepare a defense. In the analogous pretrial incarceration context, detained individuals are more likely to be convicted, and sentenced to longer terms of incarceration, than comparable individuals who can prepare their defense out of custody.[6] And incarceration makes communities less safe, too: just two or three days of pretrial detention increases the risk of arrest on new charges for even low-risk persons.[7]

### NAMED PLAINTIFF ALLEGATIONS

53.     Mr. Antowan Hagans is a 30-year-old man on Supervised Release for an offense that occurred a decade ago when he was 20 years old.

54.     Until his recent arrest and continued detention by the Commission, he had been living with his mother, who relies on his presence both for fulfilling daily responsibilities and for emotional support after years of suffering from domestic abuse at the hands of ex-boyfriends.

55.     A decade ago, when Mr. Hagans was 20 years old, he was involved in an armed robbery with several co-defendants. He deeply regrets his actions, expressed remorse then and now, and was sentenced to 72 months of incarceration and five years of supervised release.

56.     Mr. Hagans has not been involved in any violent conduct since then. His only other conviction is for unlawful possession of a firearm in 2021.

---

[6] *See* Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, Laura & John Arnold Found., at 12–18 (2013); Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J. L. Econ. & Org. 511, 535-36 (2018); Will Dobbie et al., *The Effects of Pre-Trial Detention on Conviction, Future Crime and Employment: Evidence from Randomly Assigned Judges,* 108 Am. Econ. Review 201, 203 (2018) (finding pre-trial release decreases the probability of being found guilty by 14 percentage points).

[7] *See* Timothy R. Schnacke, *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform*, Nat'l Inst. of Corr., at 16–17 (2014).

57.     Mr. Hagans was released from incarceration on March 17, 2023, and spent two years in the community being dually supervised by both the District Court (for the firearm possession conviction) and the United States Parole Commission (for the robbery conviction).

58.     Although Mr. Hagans was being dually supervised by both the District Court (via the U.S. Probation Office) and the U.S. Parole Commission (via the Court Services and Offender Supervision Agency), the U.S. Probation Office was designated as Mr. Hagans' primary supervisor.

59.     Mr. Hagans formed a good relationship with his probation officer, who has reported that Mr. Hagans has been compliant with reporting, submitting to drug testing, and has maintained a stable residence.

60.     Since returning home, Mr. Hagans has attended treatment when possible given transportation issues, and has tried to obtain employment

61.     Mr. Hagans participated in a resource job fair and in workforce development services with the Mayor's Office of Returning Citizens Affairs (MORCA).

62.     Mr. Hagans has made several efforts to obtain employment and has even had job offers extended only to be rescinded after a criminal background check.

63.     In March of 2025, Mr. Hagans was arrested for alleged gun possession.

64.     While conducting a random patrol near Mr. Hagans' home, officers stopped two unmarked vehicles in front of Mr. Hagans. After being approached at night and not knowing who was in the vehicles, Mr. Hagans began running to his apartment for safety.

65.     After plainclothes officers chased Mr. Hagans into his apartment and ran up the stairs, an officer grabbed him and they both collided with Mr. Hagans' mother, who was coming down the steps.

66. After they had tumbled to almost the bottom of the stairwell, a firearm appeared from the melee. Mr. Hagans' mother, who had tumbled down the stairs with her son and the officer, immediately exclaimed that the firearm belonged to her.

67. Years earlier, while Mr. Hagans was incarcerated and his mother was living alone, she obtained a concealed carry pistol license so that she had a way to protect herself if necessary. Officers confirmed that Mr. Hagans' mother had a license to carry a firearm and that the gun they found on the stairs was properly registered to her.

68. Nevertheless, they arrested Mr. Hagans, and he has been charged with possessing a firearm in the District Court for the District of Columbia, Case No. 25-cr-00114.

69. These same allegations have resulted in supervised release revocation proceedings. Eleven days after his arrest, the Parole Commission instituted supervised release revocation proceedings against Mr. Hagans based on the same allegations that are the basis of the criminal case. The sole other allegation against Mr. Hagans is a failure to attend four appointments with a therapist.

70. A final revocation hearing is currently scheduled for June 9, 2025.

71. The Magistrate Judge assigned Mr. Hagans' case in federal court held two lengthy detention hearings and determined that Mr. Hagans should not be detained pending trial.

72. After reviewing the BWC footage, the Magistrate Judge concluded that the weight of the evidence strongly favored release.

73. The Magistrate Judge also concluded that conditions of release could be fashioned to reasonably assure the safety of the community and Mr. Hagans' appearance in court.

74. The government appealed this decision to the District Court Judge, who denied the government's motion and affirmed Mr. Hagans' pretrial release.

75.     The U.S. Probation Office—the primary entity supervising Mr. Hagans—did not request that he be held pending any revocation proceedings.

76.     A third federal judge responsible for Mr. Hagans' federal probation also declined to incarcerate him pending his probation violation hearing.

77.     Even though three federal judges and the U.S. Probation Office determined that Mr. Hagans should not be incarcerated pending the disposition of this alleged conduct, the Parole Commission has held Mr. Hagans pending his supervised release revocation hearing.

78.     At Mr. Hagans' probable cause hearing for revocation of his supervise release, the Parole Commission did not make any individualized determination about whether pre-revocation detention was appropriate in this case. Instead, it kept Mr. Hagans incarcerated by default pursuant to its automatic detention policy.

79.     Mr. Hagans is thus currently incarcerated at the D.C. Jail solely due to the Commission's automatic detention policy, and despite the decision of *three* federal judges to release him pending adjudication of these allegations.

80.     Beyond separating him from his family, including his mother who depends on him, the Commission's conduct has resulted in Mr. Hagans' incarceration in a jail that is notoriously dangerous and unsanitary.

81.     Since Mr. Hagans has been incarcerated in the D.C. Jail, he has lived for days without running water. Unable to brush his teeth or even flush the toilet, Mr. Hagans has lived with standing sewage in his cell.

82.     Mr. Hagans was also provided rotten milk, which caused severe intestinal issues that are not being properly treated.

83.    Mr. Hagans continues to suffer under these unsanitary and inhumane conditions despite not having been found guilty of any criminal conduct or any violation of supervision, and despite three federal judges ordering his release.

## CLASS ALLEGATIONS

84.    Pursuant to Fed. R. Civ. P. 23(b)(2), Plaintiff seeks to represent a class of all people on supervised release for D.C. Code offenses who are or will be detained by the United States Parole Commission pending a revocation hearing.

85.     Plaintiff reserves the right to amend or modify the class definitions or to establish sub-classes as appropriate if discovery or further investigation reveals that the class should be expanded or otherwise modified.

86.    The class meets the prerequisites of Federal Rule of Civil Procedure 23(a).

87.    Numerosity (Rule 23(a)(1)): The class is so numerous that joinder is impracticable. Defendants hold hundreds of revocation hearings each year, and they incarcerate every individual pending a final revocation hearing for whom they have found probable cause of a violation of supervised release. The class is thus numerous.

88.    Joinder is also inherently impracticable because the number of unnamed, future class members is unknown and will continue to rise as more people are arrested by the Parole Commission and detained pending revocation.

89.    Joinder is impracticable also because proposed class members are highly unlikely to file individual suits on their own behalf given practical barriers, including indigency.

90.    Commonality (Rule 23(a)(2)): The claims of the class share common issues of law, including but not limited to whether the Parole Commission is legally authorized to incarcerate

people before revoking their supervision and whether the Commission's automatic detention policy is constitutional and lawful under applicable statutes and regulations.

91.     Typicality (Rule 23(a)(3)): The claims of the named Plaintiff are typical to the class: he has been unlawfully incarcerated before any revocation of his supervised release.

92.     Adequacy (Rule 23(a)(4)): Plaintiff is an adequate class representative who meets all of the requirements of Rule 23(a)(4). He has no conflict of interest with other class members, will fairly and adequately protect the interests of the class, and understands his responsibilities as class representative. Counsel for Plaintiff have experience litigating class actions, cases involving the rights of people on supervision, and legal violations by the United States Parole Commission.

93.     Defendants have acted, and will act, on grounds generally applicable to the class, thereby making relief appropriate as to the class as a whole. The class may therefore properly be certified under Fed. R. Civ. P. 23(b)(2).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Writ of Habeas Corpus, 28 U.S.C. § 2241
### *Violation of Non-Detention Act*
### *On Behalf of All Class Members and Against all Defendants*

94.     28 U.S.C. § 2241 allows this Court to grant a writ of habeas corpus because class members, including Mr. Hagans, are "in custody in violation of the . . . laws . . . of the United States."

95.     The Non-Detention Act prohibits the detention of a United States citizen without statutory authorization: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a).

96.     No statute authorizes the United States Parole Commission to detain individuals prior to revoking their supervised release.

97.    Therefore, the United States Parole Commission lacks authority to "imprison[] or otherwise detain[]" class members. *See id.*

**SECOND CLAIM FOR RELIEF**
**Procedural and Substantive Due Process, U.S. Const. amend. V.**
***On Behalf of All Class Members and Against the United States Parole Commission, Patricia Cushwa in Her Official Capacity, and Pamela Bondi in Her Official Capacity***

98.    The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

99.    Plaintiff and class members have a right to an individualized determination as to whether detention pending a revocation hearing is appropriate.

100.    Defendants deprive class members of this individualized determination by automatically jailing everyone on supervised release pending their revocation hearing.

101.    Defendants' unlawful practice of automatically detaining everyone on supervised release who is awaiting a final revocation hearing without any assessment to ensure such detention is appropriate creates a risk of erroneous detention and violates Plaintiff and class members' procedural due process rights.

102.    Indeed, Defendants afford *no* procedural protections to prevent inappropriate detentions, because they jail every person until their revocation hearing without regard to the seriousness of the alleged violation, the likelihood of returning for the final hearing, or whether the person poses a public safety risk.

103.    Further, Defendants' unlawful practice of detaining all individuals on supervised release pending their revocation hearing without any individualized finding violates class members' substantive due process rights because there is no legitimate justification for this automatic detention.

104.    As a result of Defendants' actions, Plaintiff and class members are experiencing irreparable harm: detention at the D.C. Jail.

### THIRD CLAIM FOR RELIEF
**Writ of Habeas Corpus, 28 U.S.C. § 2241**
*Violation of Federal Regulation Requiring Exercise of Discretion*
*On Behalf of All Class Members and Against all Defendants*

105.    The Commission's regulations "with respect to offenders serving terms of supervised release imposed by the Superior Court of the District of Columbia" state "the procedures followed by the Commission in exercising [its] authority shall be those set forth with respect to offenders on federal parole at 18 U.S.C. 4209 through 4215." 28 C.F.R. § 2.200.

106.    18 U.S.C. § 4214, in turn, states that any alleged violator shall be accorded the opportunity to have a preliminary hearing, and "after a finding of probable cause the Commission may restore any parolee to parole supervision if . . . incarceration of the parolee pending further revocation proceedings is not warranted by the alleged frequency or seriousness of such violation or violations" and the individual is "not likely to fail to appear for further proceedings" and "does not constitute a danger to himself or others."

107.    In other words, the statute governing the U.S. Parole Commission's procedures explicitly directs the Commission to consider several enumerated factors in determining whether someone on supervised release for a D.C.-code offense should be jailed pending their revocation hearing.

108.    The Commission does not consider these factors when ordering people detained pending their supervised release revocation proceedings. Rather, the Commission detains everyone pending revocation of supervised release pursuant to an automatic detention policy.

109.    The Commission acts unlawfully when it fails or refuses to exercise its statutorily required discretion, and when it fails to consider statutory factors circumscribing its exercise of discretion.

110.    Therefore, class members' incarceration does not comport with the Commission's statutory obligations, and Mr. Hagans and class members are entitled to habeas relief.

**FOURTH CLAIM FOR RELIEF**
**Equal Protection, U.S. Const. amend. V.**
*On Behalf of All Class Members and Against the United States Parole Commission, Patricia Cushwa in Her Official Capacity, and Pamela Bondi in Her Official Capacity*

111.    The Fifth Amendment precludes the federal government from treating similarly situated parties differently for no rational reason. *See 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003); *Fraternal Order of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998) ("Equal protection analysis is substantially identical under the Fifth Amendment and the Fourteenth."), reh'g granted on other grounds, 173 F.3d 898 (D.C. Cir. 1999).

112.    Class members—people on supervised release for D.C. Code offenses—are similarly situated to people on probation for D.C. Code offenses, and people on supervised release and probation for federal offenses.

113.    Indeed, as to all of these categories of people on supervision, pre-hearing release is provided for in the relevant statutes and regulations.

114.    Yet the government treats them differently. Pre-hearing release is granted to individuals on probation for D.C. Code offenses and individuals on supervised release and probation for federal offenses. Yet, for class members—those on supervised release for D.C. Code offenses—this pre-hearing release is unavailable due to the government's automatic detention policy that does not consider whether detention is appropriate in individual cases.

115.    There is no rational basis for depriving class members of consideration for pre-hearing release that is afforded to similarly situated people on probation and federal supervised release.

116.    Defendants' automatic detention policy thus violates the Fifth Amendment because it treats similarly situated parties disparately without a rational basis to do so.

### RELIEF REQUESTED

Wherefore, Plaintiff and proposed class members respectfully request that the Court:

A.  Order the release of Mr. Hagans and other class members pending their revocation hearings;

B.  Certify the proposed class under Rule 23, and appoint the named Plaintiff as class representative and the undersigned counsel as class counsel;

C.  Declare that Defendants violate Plaintiffs' rights under the United States Constitution and laws of the United States by automatically jailing those arrested for violating their supervised release pending their revocation hearing;

D.  Enter injunctive relief in Plaintiffs' favor enjoining Defendants from incarcerating individuals prior to revoking their supervision or, in the alternative, from utilizing an automatic detention policy to detain all individuals on supervised release who are awaiting a final revocation hearing without individualized determinations;

E.  Award such further relief as the Court deems appropriate.

Dated: May 26, 2025                                    Respectfully Submitted,

*/s/ Hanna M. Perry*
Hanna M. Perry (D.C. Bar No. 90003756)
hperry@pdsdc.org
Zoé E. Friedland (D.C. Bar No. 1781910)
zfriedland@pdsdc.org

PUBLIC DEFENDER SERVICE FOR THE
DISTRICT OF COLUMBIA
633 3rd Street NW
Washington, D.C. 20001
Tel.: (202) 579-0633