**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ANTOWAN HAGANS, <br><br> Plaintiff-Petitioner, <br> *Individually and on behalf of all other similarly situated* <br><br> v. <br><br> UNITED STATES PAROLE COMMISSION, et al. <br><br> Defendants-Respondents. | Case No. 25-cv-1671 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A
<u>PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

LEGAL BACKGROUND ..................................................................................................... 3

   I.   Supervised Release Was Created to "Ease the Defendant's Transition Into the Community." ...................................................................................................................... 3

   II.   In Washington, D.C., the United States Parole Commission Has Authority Over Individuals on Supervised Release. ..................................................................................... 5

   III.   Even Though the Commission's Procedures Provide for a Release Mechanism, It Detains Everyone Pending a Revocation Hearing. ............................................................................ 6

   IV.   The Commission's Automatic Detention Policy is an Anomaly. ....................................... 8

FACTUAL BACKGROUND ................................................................................................ 11

LEGAL STANDARD ........................................................................................................... 15

ARGUMENT ......................................................................................................................... 15

   I.   Likelihood of Success on the Merits ................................................................................ 15

     A. The Non-Detention Act Precludes Pre-Revocation Detention. ...................................... 15

     B. Due Process Requires Individualized Determinations for Pre-Revocation Detention. .... 17

       i.   Mr. Hagans' and Putative Class Members' Liberty Interests Are Great. ..................... 18

       ii.   Mr. Hagans' and Putative Class Members' Detention Violates Procedural Due Process. ..................................................................................................................... 20

       iii.   Mr. Hagans' and Putative Class Members' Detention Violates Substantive Due Process. ..................................................................................................................... 25

     C. Applicable Law Compels Individualized Determinations for Pre-Revocation Detention. ........................................................................................................................ 32

     D. The Commission's Automatic Detention Policy Violates the Equal Protection Clause. . 36

   II.   Irreparable Harm ............................................................................................................. 39

   III.   Balance of the Equities and Public Interest ..................................................................... 43

CONCLUSION ...................................................................................................................... 44

# TABLE OF AUTHORITIES

**Cases**

*3883 Connecticut LLC v. District of Columbia*,
    336 F.3d 1068 (D.C. Cir. 2003) ........................................................... 36

*Addington v. Texas*,
    441 U.S. 418 (1979) ........................................................................ 28

*Aracely, R. v. Nielsen*,
    319 F. Supp. 3d 110 (D.D.C. 2018) ...................................................... 39

*Bailey v. U.S. Parole Comm'n*,
    769 F. Supp. 1025 (N.D. Ill. 1991) ...................................................... 35

*Barker v. Wingo*,
    407 U.S. 514 (1972) ........................................................................ 21

*Bell v. Wolfish*,
    441 U.S. 520 (1979) ............................................................. 25, 30, 31

*Clymer v. City of Adelanto*,
    No. 16-cv-2535, 2017 WL 10592143 (C.D. Cal. Apr. 20, 2017) .................. 37

*Cty. Of Sacramento v. Lewis*,
    523 U.S. 833 (1998) .................................................................. 17, 18

*Damus v. Nielsen*,
    313 F. Supp. 3d 317 (D.D.C. 2018) ....................................................... 3

*Davenport v. Int'l Brotherhood of Teamsters*,
    166 F.3d 356 (D.C. Cir. 1999) ............................................................ 15

*Davis v. United States Parole Comm'n*,
    No. 20-cv-2897, 2021 WL 05758820 (D.D.C. Dec. 3, 2021) ...................... 40

*Demore v. Kim*,
    538 U.S. 510 (2003) ........................................................................ 27

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................ 43

*Escoe v. Zerbst*, 295 U.S. 490 (1935) .................................................... 19

*Faheem-El v. Klincar*,
    620 F. Supp. 1309 (N.D. Ill. 1985) ...................................................... 23

*Faheem-El v. Klincar*,
    841 F.2d 712 (7th Cir. 1988) ................................................... 23, 24, 27

*Foucha v. Louisiana*,
    504 U.S. 71 (1992) ..................................................................... 25, 26

*Fowler v. U.S. Parole Comm'n*,
  94 F.3d 835 (3d Cir. 1996) ................................................................... 19

*Fraternal Ord. of Police, Metro. Police Dep't Lab. Comm., D.C. Police Union v. D.C.*,
  45 F.4th 954 (D.C. Cir. 2022) ................................................................ 39

*Fraternal Order of Police v. United States*,
  152 F.3d 998, 1002 (D.C. Cir. 1998),
  *reh'g granted on other grounds*, 173 F.3d 898 (D.C. Cir. 1999) ............................ 36

*Gagnon v. Scarpelli*,
  411 U.S. 778 (1973) ........................................................... 19, 20, 21, 24

*General Elec. Co. v. Seamans*,
  340 F. Supp. 636 (D.D.C. 1972) ............................................................. 44

*Gerstein v. Pugh*,
  420 U.S. 103 (1975) ........................................................................ 27

*Ghanayem v. Holder*,
  555 F. App'x 611 (7th Cir. 2014) ........................................................... 34

*Goings v. Court Services and Offender Supervision Agency for D.C.*,
  786 F. Supp. 2d 48 (D.D.C. 2011) ....................................................... 26, 27

*Howe v. Smith*,
  452 U.S. 473 (1981) ........................................................................ 16

*Hutchinson v. Stuckey*,
  952 F.2d 1418 (D.C. Cir. 1992) ............................................................. 34

*In the Matter of B.P.*,
  397 A.2d 974 (D.C. 1979) .................................................................... 9

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015) ........................................................................ 30

*Lopez-Valenzuela v. Arpaio*,
  770 F.3d 772 (9th Cir. 2014) .......................................................... *passim*

*Ludecke v. Watkins*,
  335 U.S. 160 (1948) ........................................................................ 27

*Luther v. Molina*,
  627 F.2d 71 (7th Cir. 1980) ................................................................ 33

*Luther v. Molina*,
  627 F.2d 71, 76 (7th Cir. 1980) ............................................................ 37

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) .................................................................... 21, 22

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) ................................................................. 43

*Mergentime Corp. v. Washington Metro. Area Transit Auth.*,
   166 F.3d 1257 (D.C. Cir. 1999) ............................................................. 34

*Morrissey v. Brewer*,
   408 U.S. 471 (1972) ....................................................... 19, 20, 21, 24

*Neuren v. Adduci, Mastriani, Meeks & Schill*,
   43 F.3d 1507 (D.C. Cir. 1995) ............................................................. 37

*Nken v. Holder*,
   556 U.S. 418 (2009) ........................................................................... 44

*Padilla v. Rumsfeld*,
   352 F.3d 695 (2d Cir. 2003), *rev'd and remanded on other grounds*, 542 U.S. 426 (2004) .... 16

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ................................................. 39, 44

*Reno v. Flores*,
   507 U.S. 292 (1993) ........................................................................... 26

*Richardson v. United States*,
   927 A.2d 1137 (D.C. 2007) ................................................................... 8

*Rodriguez v. Herrera*,
   72 F. Supp. 2d 1229 (D. Colo. 1999) ................................................ 33, 34

*Schall v. Martin*,
   467 U.S. 253 (1984) ....................................................................... 28, 30

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ............................................................. 15

*Sherman v. U.S. Parole Comm'n*,
   502 F.3d 869 (9th Cir. 2007) ............................................................... 33

*Shvartser v. Lekser*,
   308 F. Supp. 3d 260 (D.D.C. 2018) ..................................................... 43

*U. S. ex rel. Napoli v. State of N. Y.*,
   379 F. Supp. 603 (E.D.N.Y. 1974) ...................................................... 33

*U.S. ex rel. Dereczynski v. Longo*,
   368 F. Supp. 682 (N.D. Ill. 1973) ....................................................... 39

*U.S. ex rel. Hebel v. Luther*,
   544 F. Supp. 179 (N.D. Ill. 1982) ....................................................... 36

*United States v. Flores*,
   130 F.4th 465 (5th Cir. 2025) ............................................................... 4

*United States v. Gaskell*,
   134 F.3d 1039 (11th Cir. 1998) ............................................................................... 37

*United States v. Granderson*,
   511 U.S. 39 (1994) ................................................................................................... 20

*United States v. Hagans*,
   No. 21-cr-00187 (D.D.C. 2021) ....................................................................... 11, 14

*United States v. Hagans*,
   No. 25-cr-00114 (D.D.C. 2025) ............................................................................. 13

*United States v. Haymond*,
   588 U.S. 634 (2019) ....................................................................................... 3, 19, 20

*United States v. Johnson*,
   529 U.S. 53 (2000) .............................................................................................. 4, 20

*United States v. Latimer*,
   991 F.2d 1509 (9th Cir. 1993) ............................................................................... 35

*United States v. Loy*,
   237 F.3d 251 (3d Cir. 2001) .................................................................................. 26

*United States v. Loya*,
   23 F.3d 1529 (9th Cir. 1994) ............................................................................. 9, 35

*United States v. McLean*,
   749 F. Supp. 3d 167 (D.D.C. 2024) ...................................................................... 24

*United States v. Mercado*,
   No. 3:13-cr-181, 2025 WL 297429 (D. Conn. Jan. 24, 2025) ................................ 16

*United States v. Mooney*,
   654 F.2d 482 (7th Cir. 1981) ................................................................................. 34

*United States v. Myers*,
   426 F.3d 117 (2d Cir. 2005) ............................................................................ 26, 27

*United States v. Nishida*,
   53 F.4th 1144 (9th Cir. 2022) .................................................................................. 5

*United States v. Salerno*,
   481 U.S. 739 (1987) ......................................................................................... *passim*

United States v. Scott,
   450 F.3d 863 (9th Cir. 2006) ................................................................................. 27

*United States v. Stephens*,
   424 F.3d 876 (9th Cir. 2005) ................................................................................... 5

*United States v. Stubbs*,
   No. 18-CR-6093-MAV, 2025 WL 1094293 (W.D.N.Y. Apr. 11, 2025) ................... 9

*United States v. Trotter*,
   321 F. Supp. 3d 337 (E.D.N.Y. 2018) ..................................................................... 4

*V.C. et al., v. District of Columbia*,
   No. 23-cv-01139 (D.D.C. 2023) ........................................................................... 41

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ............................................................................................. 25

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................. 15

*Youngberg v. Romero*,
   457 U.S. 307 (1982) ............................................................................................. 25

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ............................................................................... 25, 30, 31

**Statutes & Regulations**

18 U.S.C. § 3143 ............................................................................................... 9, 16

18 U.S.C. § 3553 .................................................................................................. 20

18 U.S.C. § 3562 .................................................................................................. 20

18 U.S.C. § 3565 .................................................................................................. 20

18 U.S.C. § 3583 ..................................................................................... 4, 5, 17, 20

18 U.S.C. § 3621 .................................................................................................. 33

18 U.S.C. § 4001 ................................................................................... 1, 3, 15, 17

18 U.S.C. § 4214 ........................................................................................... *passim*

28 C.F.R. § 2.200 .............................................................................................. 9, 32

28 C.F.R. § 2.215 .............................................................................................. 8, 40

28 C.F.R. § 2.216 ................................................................................................... 7

28 U.S.C. § 2.214 .................................................................................................. 32

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1006, 100 Stat. 3207 ................................. 5

D.C. Code § 23-1325 ............................................................................................. 38

D.C. Code § 24-133 ......................................................................................... 6, 9, 16

D.C. Code § 24-403.01 .......................................................................................... 20

Fed. R. Crim. P. 32.1 ..................................................................................... *passim*

Super. Ct. Crim. R. 32.1(1)(C) ........................................................................... 8, 38

**Other Authorities**

Advisory Comm'n on Sentencing, *Report of the District of Columbia Advisory Commission on Sentencing* 19 (2005)................................................................................................ 5

Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, Laura & John Arnold Found. (2013) ................................... 41

Emilia Calma & Yesim Sayin, *Processing through D.C.'s criminal justice system: Agencies, roles, and jurisdiction*, D.C. Policy Center (Mar. 2, 2023) ................................. 7, 40

*Incarceration's Front Door: The Misuse of Jails in America*, Vera Institute of Justice (July 29, 2015)........................................................................................................... 40

Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J. L. Econ. & Org. 511 (2018)............................................................. 41

S. Rep. No. 94-369 (1975) ........................................................................................ 33, 40

S. Rep. No. 98-225 (1983) ...........................................................................................4, 5

Sam McCann, *How "Collateral Consequences" Keep People Trapped in the Legal System*, Vera Institute of Justice (Nov. 29, 2023) ................................................................ 41

Timothy R. Schnacke, *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform*, Nat'l Inst. of Corr. (2014) ........................ 42

U.S. Dep't of Justice, United States Marshals Service, Memorandum to Quincy Booth re: D/DC USMS Prisoners Detained by District of Columbia Department of Corrections ...... 42

Will Dobbie et al., *The Effects of Pre-Trial Detention on Conviction, Future Crime and Employment: Evidence from Randomly Assigned Judges,* 108 Am. Econ. Review 201 (2018) ................................................................................................................................. 41

## INTRODUCTION

The United States Parole Commission has a policy of automatically jailing everyone in Washington, D.C. who has been accused of violating their conditions of supervised release and is awaiting a revocation hearing. That policy violates federal statutes and the Constitution. Nevertheless, pursuant to that policy, hundreds of people are detained each year for months on end—without any individualized assessment of whether such detention is appropriate or necessary—as they await a hearing on the merits of the allegations against them. Antowan Hagans is one such individual. Following his arrest in March of this year for unlawful possession of a firearm, three federal judges reviewed the accusations, considered flight risk and dangerousness, and determined that his release from the D.C. Jail (or the "Jail") pending adjudication of the merits of that case was appropriate. But Defendants jailed him anyway. They did not express a different interpretation of the facts or Mr. Hagans' circumstances, nor did they even evaluate such facts and circumstances. Mr. Hagans is in jail right now because of the Parole Commission's illegal policy.

Defendants' decision to detain Mr. Hagans and other members of the class without even evaluating whether such detention is necessary is unlawful. Their detention violates the Non-Detention Act because Congress has not given the United States Parole Commission, a federal agency, any authority to "imprison[] or otherwise detain[]" someone prior to their revocation at all, let alone without an individualized determination. 18 U.S.C. § 4001(a). It violates procedural and substantive due process because this type of categorical and automatic decision that deprives Mr. Hagans and class members of their liberty—without any individualized assessment of the detention's necessity—is devoid of any process, results in erroneous detention, and is not justified by any compelling governmental interest. The policy also violates Defendants' duty to exercise their discretion. The law provides that an individual may be released pending a revocation hearing

if detention "is not warranted by the alleged frequency or seriousness" of the violations and the individual is not a flight risk or a danger.  18 U.S.C. § 4214(a)(1)(A).  By choosing not to exercise any discretion, Defendants violate their statutory and regulatory obligations.  Finally, the law violates equal protection by treating people like Mr. Hagans on supervised release differently from similarly situated people on community supervision without any rational basis.

Indeed, Defendants' categorical detention policy is an aberration.  People on probation as well as people on supervised release related to federal convictions are afforded the opportunity to be released pending a revocation hearing.  Judges routinely make individualized determinations about flight risk and dangerousness when ordering release in these analogous contexts.  And Defendants previously allowed individuals to remain in the community pending their revocation hearing.  Ex. B, Epps Decl. ¶ 6.  But today, Defendants have abandoned this practice and unlawfully detain everyone for whom they have decided to pursue revocation.

Defendants' decision to jail Mr. Hagans and other class members pending their hearing without any individualized detention determination is so clearly unlawful, and the harm so severe, that they are entitled to preliminary injunctive relief.  Defendants' policy results in months-long detention at the Jail for hundreds like Mr. Hagans each year.  The harm from this detention is ongoing and irreparable.  The conditions at the D.C. Jail, which is widely known for being dangerous and unsanitary, have only worsened in recent years.  Three weeks ago, the Office of the D.C. Auditor issued a report chronicling the Jail's unsanitary conditions, contaminated food, inaccessible medical care, and over-reliance on restrictive housing that doubles the national average.  Ex. C, A Report by the Office of the D.C. Auditor: Urgent Need for New D.C. Jail (May 28, 2025) ("D.C. Auditor Report") at 1–2.  The Jail is also dangerous, with a death rate more than 3.5 times the national average.  *Id.* at 48.  Mr. Hagans has not been spared from these horrors.  In

the past three months, he has lived in a cell that frequently floods with sewage, was provided spoiled milk, has been unable to access medication and medical care, and goes days without running water.  Ex. A, Hagans Decl. ¶¶ 15–31.

Accordingly, Mr. Hagans requests that this Court issue an order directing the United States Parole Commission to release him and class members, as they lack authority to detain them pending their revocation hearings.  *See* 18 U.S.C. § 4001(a).  In the alternative, Mr. Hagans requests that the Court declare the Commission's failure to make an individualized detention decision unlawful, and order the Commission to promptly make individualized determinations at a hearing of whether release is appropriate, pursuant to the factors in 18 U.S.C. § 4214.[1]

## LEGAL BACKGROUND

### I.    Supervised Release Was Created to "Ease the Defendant's Transition Into the Community."

Supervised release was established in the federal system in 1984, when "Congress overhauled federal sentencing procedures to make prison terms more determinate and abolish the practice of parole."  *United States v. Haymond*, 588 U.S. 634, 651 (2019).  Supervised release was created to be fundamentally different from other forms of community supervision. Parole and probation are means by which an individual can serve a portion of their sentence in the community. Supervised release, by contrast, does not "replace a portion of the defendant's prison term," but rather is intended to "encourage rehabilitation *after* the completion of his prison term."  *Haymond*, 588 U.S. at 652 (cleaned up) (emphasis added).  In other words, while parole and probation are

---

[1] The Court may provisionally certify the class and grant class-wide preliminary injunctive relief to stop Defendants' unlawful practices. *See, e.g.*, *Damus v. Nielsen*, 313 F. Supp. 3d 317, 329 (D.D.C. 2018).

3

part of "the term of imprisonment," supervised release is "a separate part of the defendant's sentence," S. Rep. No. 98-225, at 123 (1983), enacted "to assist people who have served prison terms with rehabilitation and reintegration into the law-abiding community," *United States v. Trotter*, 321 F. Supp. 3d 337, 339 (E.D.N.Y. 2018). *See also United States v. Flores*, 130 F.4th 465, 470 (5th Cir. 2025) (referring to Congress's "intent" that supervised release "assist individuals in their transition to community life").[2]

The difference is not just semantic.  As supervised release is not part of the term of imprisonment, its primary goal cannot be punishment or retribution.  Rather, it was created "to ease the defendant's transition into the community" following a prison term.  S. Rep. No. 98-225, at 124 (1983).  Supervised release thus "may not be imposed for purposes of punishment or incapacitation since those purposes will have been served to the extent necessary by the term of imprisonment."  *Id.* at 125; *see also United States v. Johnson*, 529 U.S. 53, 59 (2000) ("[s]upervised release fulfills rehabilitative ends, distinct from those served by incarceration"); 18 U.S.C. § 3583(e)(3) (federal statute governing supervised release, which omits retribution as a factor that courts should consider when modifying or revoking supervised release).

Given this purpose, Congress did not initially provide for revocation for a violation of a condition of supervised release "because it does not believe that a minor violation of a condition of supervised release should result in resentencing of the defendant."  S. Rep. No. 98-225, at 125

---

[2] There are four relevant categories of supervision: (1) probation for federal offenses, which is administered by district courts; (2) supervised release for federal offenses, which is administered by district courts; (3) probation for D.C. Code offenses, which is administered by the D.C. Superior Court; and (4) supervised release for D.C. Code Offenses, which is administered by the U.S. Parole Commission.  The type of supervision someone is subject to depends on the court in which they are sentenced, and the type of sentence given.  A court—either a federal court or the D.C. Superior Court—can sentence an individual to probation in lieu of time in prison, while a period of supervised release necessarily follows a term of incarceration.

(1983).  Instead, courts could modify the conditions of release in response to violations or initiate contempt proceedings for more serious and repeated violations.  *Id.* at 133.  Ultimately, before these policy changes went into effect, Congress added a revocation mechanism via a "technical amendment."  Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1006, 100 Stat. 3207.  Despite this last-minute addition, the core function and purpose of supervised release remained distinct from its predecessors in community supervision.

## II.    In Washington, D.C., the United States Parole Commission Has Authority Over Individuals on Supervised Release.

Thirteen years later, Congress "borrowed and incorporated" this system of supervised release into the D.C. Code.  *See* Advisory Comm'n on Sentencing, *Report of the District of Columbia Advisory Commission on Sentencing* 19 (2005).  Through the Revitalization Act of 1997 and the Sentencing Reform Amendment Act of 2000, Congress and the D.C. Council abolished parole for people convicted of D.C. Code offenses in D.C. Superior Court and replaced it with supervised release.  Like its federal counterpart, supervised release in Washington, D.C. is "significant[ly] differen[t]" from parole, as the "purpose[] of supervised release" is "rehabilitation and reintegration into the community rather than further punishment or incapacitation."  *Id.* at 16.

In the federal system, revocation decisions for both supervised release and probation must be made by a judge.  *See* 18 U.S.C. § 3583(e)(3) ("The court may . . . revoke a term of supervised release."); Fed. R. Crim. P. 32.1(b)(2) ("[T]he court must hold the revocation hearing.").  Courts have recognized that "a nonjudicial officer may not decide the nature or extent of the punishment" imposed on either someone on probation or supervised release, because "under our constitutional system the right to . . . impose the punishment provided by law is judicial."  *United States v. Nishida*, 53 F.4th 1144, 1150 (9th Cir. 2022) (quoting *United States v. Stephens*, 424 F.3d 876, 881 (9th Cir. 2005)).

But in Washington, D.C., through the Revitalization Act, Congress delegated authority over people on supervised release—including decisions regarding revocation—to the United States Parole Commission, a federal agency. D.C. Code § 24-133(c)(2) (providing that supervised releasees are "subject to the authority of the United States Parole Commission until completion of the term of supervised release"). That same D.C. Code provision provides that the "United States Parole Commission shall have and exercise the same authority as is vested in the United States district courts by paragraphs (d) through (i) of § 3583 of title 18"—the law that governs district courts' authority over people on supervised release. *Id.* (emphasis added). These paragraphs provide the authority to revoke supervised release and impose a term of imprisonment; they do not, however, provide the authority to detain someone without revoking their supervised release.

Today, this federal agency exists almost exclusively to supervise people in Washington, D.C. and discipline those accused of violating conditions of release. In 2022, for example, the Commission's caseload included 53 individuals on federal parole, compared to 1,695 people on supervised release for D.C. Code offenses. Ex. D, U.S. Parole Commission: Congressional Report FY 2022 at 6. The bulk of the Commission's work today involves revocation proceedings for people on supervised release in Washington, D.C. In 2022, for example, the Commission conducted 474 probable cause hearings and 288 revocation hearings for people on supervised release. *Id.* at 11.

### III.    Even Though the Commission's Procedures Provide for a Release Mechanism, It Detains Everyone Pending a Revocation Hearing.

When an individual on supervised release for a D.C. Code offense is accused of violating a condition of supervised release, the Commission can arrest the individual and initiate revocation proceedings. These proceedings follow either alleged criminal conduct or administrative violations of conditions of release—known as "technical violations." Technical violations occur

when someone fails to comply with a condition of supervision, such as missing an appointment with a supervision officer, being unable to get a job, missing a drug test, associating with someone with a felony conviction, or failing to attend a required program. They are considered "technical" because they are not violations of criminal law, but rather of the administrative terms of supervision.[3]

Revocation proceedings begin with a probable cause hearing.[4] If, at the hearing, the Commission finds probable cause, it has three options: (1) release the individual, terminate revocation proceedings, and reinstate them to supervision; (2) hold the individual and detain them pending a revocation hearing; or (3) release the individual and give them a summons to return to a revocation hearing at a future date. *See* Ex. G, United States Parole Commission: D.C. Probable Cause Hearing Digest. However, the Commission never utilizes this last option; rather, everyone who is pending a revocation hearing is automatically detained at the Jail. At a revocation hearing, which is held in a room at the Jail, a hearing examiner for the Commission decides whether to recommend that an individual's supervised release be revoked and a term of imprisonment imposed. *See* 28 C.F.R. § 2.216. A Commissioner then reviews this written recommendation and makes a final determination regarding revocation and sentencing. *Id.*

Even before the Commission determines at a revocation hearing that an individual has violated their conditions of supervision and that a prison term will be imposed, the Commission

---

[3] *See* Emilia Calma & Yesim Sayin, *Processing through D.C.'s criminal justice system: Agencies, roles, and jurisdiction*, D.C. Policy Center (Mar. 2, 2023) (describing technical violations as "missing meetings with [a] Community Supervision Officer, not submitting a drug test on time, testing positive for marijuana, and for new arrests, even if those arrests do not end in charges or conviction").

[4] An exception to this general process exists in a small number of cases where an individual is convicted of a new crime before revocation proceedings begin. When this happens, the revocation hearings may occur at the prison at a later date while the individual is serving a sentence.

jails them for up to 65 days per the governing regulation on when a hearing must be scheduled—and in practice detention often lasts much longer—as they await their revocation hearing. *See* 28 C.F.R. § 2.215(f) (giving the Commission 65 days to hold a revocation hearing). In fact, the Commission *automatically* jails people on supervised release who are pending a revocation hearing. Ex. B, Epps Decl. ¶¶ 5–6. And this automatic detention applies across the board, regardless of how minor the allegations are, or whether the sole charges are technical violations of supervision. It is even true where, as in named Plaintiff Mr. Hagans' case, the basis of the revocation proceeding is a new criminal case in which a judge found pre-trial release—not detention—appropriate. And the Commission holds revocation hearings frequently, thus routinely employing its automatic detention policy. In 2022, for example, the Commission held 288 revocation hearings for people on supervised release. Ex. D, U.S. Parole Commission: Congressional Report FY 2022 at 11.

### IV.    The Commission's Automatic Detention Policy is an Anomaly.

For those on other forms of supervision who are similarly situated to Mr. Hagans and members of the putative class—people on federal probation or supervised release, and people on probation in Washington, D.C.—the availability of release pending a revocation hearing is the norm. Individuals on probation for D.C. Code offenses are not supervised by the Parole Commission, but rather by the D.C. Superior Court.

An individual in D.C. facing probation revocation proceedings is entitled to consideration of release pending their revocation hearing under Superior Court Rule of Criminal Procedure 32.1, which provides that a court in D.C. "may release or detain the person under D.C. Code § 23-1325(b)," the law governing release pending sentencing. *See also Richardson v. United* States, 927 A.2d 1137, 1144 n.13 (D.C. 2007) (noting that a court may issue "a warrant *or summons* for violation of the conditions of probation") (emphasis added)). Judges in D.C. Superior Court make

individualized determinations before detaining individuals in the D.C. Jail pending a probation revocation hearing. This entitlement to consideration of pre-hearing release extends to juvenile court as well, where probation revocation proceedings "must be treated as if it were a pretrial detention matter," and a court thus must provide a "detailed statement of [] reasons for detention" pending the revocation hearing. *In the Matter of B.P.*, 397 A.2d 974, 976 (D.C. 1979).

In federal court, pre-hearing release is available in both supervised release and probation revocation cases. Fed. R. Crim. P. 32.1 provides that when faced with probation or supervised release revocation, a judge "may release or detain the person under 18 U.S.C. § 3143(a)(1)," which is the Bail Reform Act law governing release pending sentencing. Courts have widely recognized that individuals are "entitled to pursue release after [their] initial arrest" when facing revocation of either supervised release or probation. *United States v. Stubbs*, No. 18-CR-6093-MAV, 2025 WL 1094293, at *4 (W.D.N.Y. Apr. 11, 2025). Where an individual "moves for bail pending his or her revocation hearing, the district court shall determine the person's eligibility for release under the standards of release set forth in 18 U.S.C. § 3143." *United States v. Loya*, 23 F.3d 1529, 1531 (9th Cir. 1994).

The relevant statute and regulations contemplate a similar pre-hearing release for Mr. Hagans and other class members—people on supervised release for D.C. Code offenses who are facing potential revocation. 28 C.F.R. § 2.200 provides that, with respect to people on supervised release, the Commission shall follow the procedures "set forth with respect to offenders on federal parole at 18 U.S.C. §4209 through 4215." *See also* D.C. Code § 24-133(c)(2). These procedures include pre-hearing release where the Commission finds "incarceration . . . pending further revocation proceedings is not warranted by the alleged frequency or seriousness of such violation or violations," and the individual is not a flight risk or a danger to him or herself or others. 18

U.S.C. § 4214.  The Commission's own Manual echoes this language as well.  *See* Ex. H, U.S. Parole Commission Rules & Procedures Manual § 2.211-02.

The Parole Commission did not always have an automatic detention policy.  Within the last ten years, rather than issue arrest warrants in every case it wanted to pursue, the Commission sometimes issued a summons that required someone to appear for a revocation hearing in the community rather than be jailed pending their revocation hearing.  Ex. B, Epps Decl. ¶ 6.  These summonses were utilized in cases involving both technical violations of supervised release and alleged criminal conduct.  Ex. B, Epps Decl.  ¶ 7.  Even when the Commission did issue an arrest warrant, individuals could request that they be released following a probable cause hearing and issued a summons to appear at their revocation hearing.  In fact, the Commission's own probable cause hearing digest form includes a place to order just that, *see* Ex G, Probable Cause Hearing Digest (check box for "probable cause found" and "*summon* to a revocation hearing") (emphasis added), but the Commission no longer exercises this option.

Indeed, for people on supervised release in Washington, D.C., this procedural protection was unceremoniously abandoned several years ago.  While dozens of people remained in the community prior to their revocation hearings in previous years, only two people were released pending a supervised release revocation hearing in the past five years, and none have been released pending their hearing since 2023.  Ex. B, Epps Decl. at ¶ 6.  Rather, the Commission decided to jail everyone pending revocation at the D.C. Jail, where they are in close proximity to the room in the Jail where the revocation hearings take place.  Other than detention from the very outset, there is currently no procedure by which a person who is the subject of a revocation hearing can enter the D.C. Jail for the hearing.  In other words, by the Parole Commission's own design, being

incarcerated pending a revocation hearing is now a prerequisite for having a revocation hearing at all.

## FACTUAL BACKGROUND

Mr. Antowan Hagans is a 30-year-old man on supervised release for an offense that occurred a decade ago when he was 20 years old.  *See* Ex. F, United States Parole Commission Warrant Application.  Until his recent arrest and continued detention by the Commission, he had been living with his mother, who relies on his presence both for fulfilling daily responsibilities and for emotional support after years of suffering from domestic abuse at the hands of ex-boyfriends. Ex. A, Hagans Decl. ¶¶ 7, 9.

A decade ago, when Mr. Hagans was 20 years old, he was involved in an armed robbery with several co-defendants.  *See* Ex. F, United States Parole Commission Warrant Application. He deeply regrets his actions, expressed remorse then and now, and, after he pleaded guilty, he was sentenced to 72 months of incarceration and five years of supervised release.  *See id*.  Mr. Hagans has not been involved in any violent conduct since then.  *See* Ex. A, Hagans Decl. ¶ 13. His only other conviction is for unlawful possession of a firearm in 2021.  *See United States v. Hagans*, No. 21-cr-00187 (D.D.C. filed Mar. 5, 2021) (ABJ).  Mr. Hagans was released from incarceration on March 17, 2023, and spent two years in the community being dually supervised by both the District Court (for the firearm possession conviction) and the United States Parole Commission (for the robbery conviction).

Although Mr. Hagans was being dually supervised by both the District Court (via the U.S. Probation Office) and the U.S. Parole Commission (via the Court Services and Offender Supervision Agency), the U.S. Probation Office was designated as Mr. Hagans' primary supervisor. Ex. A, Hagans Decl. ¶ 13.  Mr. Hagans formed a good relationship with his probation

officer, and he was compliant with reporting and maintained a stable residence. *See id.* ¶¶ 7–8, 11–14. Since returning home, he has attended appointments with his therapist when possible given transportation issues, and participated in a resource job fair and workforce development services with the Mayor's Office of Returning Citizens Affairs. *See id.* ¶¶ 11, 28, 33. And while he has made several efforts to obtain employment and has even had job offers extended, they were rescinded after a criminal background check. *Id.* ¶¶ 11–12.

In March of 2025, Mr. Hagans was arrested for alleged gun possession. Ex. E, Superior Court for the District of Columbia: Gerstein Affidavit. While conducting a random patrol near Mr. Hagans' home, officers driving two unmarked vehicles stopped in front of Mr. Hagans. *Id.* After being approached at night in a dangerous neighborhood and not knowing who was in the vehicles, Mr. Hagans began running to his apartment for safety.[5] *See id.* After plainclothes officers chased Mr. Hagans into his apartment and ran up the stairs, an officer grabbed him and they both collided with Mr. Hagans' mother, who was coming down the steps. *Id.* After they had tumbled to almost the bottom of the stairwell, a firearm appeared from the melee. *Id.* Mr. Hagans' mother, who had tumbled down the stairs with her son and the officer, immediately exclaimed that the firearm belonged to her. *Id.*

Years earlier, while Mr. Hagans was incarcerated and his mother was living alone, she obtained a concealed carry pistol license so that she had a way to protect herself if necessary. Ex. A, Hagans Decl. ¶ 6. Officers confirmed that Mr. Hagans' mother had a license to carry a firearm

---

[5] The Gerstein Affidavit states that Mr. Hagans was "placing his right hand towards his front waistband area," which officers claimed they interpreted to mean Mr. Hagans had a firearm. *See* Ex. E, Superior Court for the District of Columbia: Gerstein Affidavit. However, the government has since admitted that "surveillance footage shows that, at least in the area covered by the camera frame, both of the defendant's arms swung as he ran." Gov't Opp'n to Mot. To Suppress, Dkt. No. 25 at 5 n.1, *United States v. Hagans*, No. 25-cr-00114 (D.D.C. filed Apr. 22, 2025) (AHA).

and that the gun they found on the stairs was properly registered to her.  Ex. E, Superior Court for

the District of Columbia: Gerstein Affidavit at 2.  Nevertheless, they arrested Mr. Hagans, and he

has been charged with possessing a firearm in the District Court for the District of Columbia.

*United States v. Hagans*, No. 25-cr-00114 (D.D.C. filed Apr. 22, 2025).

These same allegations have resulted in supervised release revocation proceedings.  A few

weeks after his arrest, the Parole Commission instituted supervised release revocation proceedings

against Mr. Hagans based on the same allegations that are the basis of the criminal case.  Ex. F,

United States Parole Commission Warrant Application.  The sole other allegation against Mr.

Hagans is a failure to attend four appointments with a therapist.  *Id.*  A final revocation hearing is

currently scheduled for July 14, 2025.[6]

The Magistrate Judge assigned Mr. Hagans' case in federal court held two lengthy

detention hearings and determined that Mr. Hagans should not be detained pending trial.  *See* April

14, 2025 and April 16, 2025 Minute Orders, *United States v. Hagans*, No. 25-cr-00114 (D.D.C.).

The Magistrate Judge concluded that conditions of release could be fashioned to reasonably assure

the safety of the community and Mr. Hagans' appearance in court.  *See* April 16, 2025 Minute

Order, *United States v. Hagans*, No. 25-cr-00114 (D.D.C.).  The government appealed this

decision to the District Court Judge, *see* Dkt. No. 14, *United States v. Hagans*, No. 25-cr-00114,

who denied the government's motion and affirmed Mr. Hagans' pretrial release, *see* April 23, 2025

Minute Entry, *United States v. Hagans*, No. 25-cr-00114.  A third federal judge responsible for

---

[6] The Parole Commission began revocation proceedings on April 21, 2025.  *See* Ex. F, United States Parole Commission Warrant Application.  The Commission originally scheduled Mr. Hagans' revocation hearing for June 9, 2025.  Mr. Hagans' counsel requested that the hearing be continued so he could adequately prepare for it.  Counsel also requested that the Commission reconsider its refusal to release Mr. Hagans pending revocation on May 19, 2025, detailing the arguments set forth herein.  The Commission denied this request last week, on June 9, 2025.  Ex. I, Reconsideration Letter and Parole Commission Response.

Mr. Hagans' federal probation also declined to incarcerate him pending his probation violation hearing. *See* April 25, 2025 Minute Order, *United States v. Hagans*, No. 21-cr-00187 (D.D.C.) (ABJ).

Even though three federal judges determined that Mr. Hagans should not be incarcerated pending the disposition of this alleged conduct, the Parole Commission has held Mr. Hagans in the D.C. Jail pending his supervised release revocation hearing. At Mr. Hagans' probable cause hearing for revocation of his supervise release, the Parole Commission did not make any individualized determination about whether pre-revocation detention was appropriate in this case. Ex. G, United States Parole Commission: D.C. Probable Cause Hearing Digest. Instead, it kept Mr. Hagans incarcerated by default pursuant to its automatic detention policy. Mr. Hagans is thus currently incarcerated at the D.C. Jail solely due to this policy, despite the decisions of *three* federal judges to release him pending adjudication of these allegations.

Beyond separating him from his family, including his mother who depends on him, the Commission's conduct has resulted in Mr. Hagans' incarceration in a jail that is notoriously dangerous and unsanitary. Since Mr. Hagans has been incarcerated in the D.C. Jail, he has lived for days without running water, unable to brush his teeth or even flush the toilet. Ex. A, Hagans Decl. ¶ 17. He stays locked in a cell 23 hours a day for days at a time, not allowed to go outside or even shower. *Id.* ¶ 16. The toilets have repeatedly overflowed, flooding his cell with feces and urine and soaking his socks and shoes with raw sewage. *Id.* ¶¶ 18–20. The Jail does not provide appropriate equipment to clean the sewage, and the towels and sheets they do provide are soiled with dirt and bloodstains. *Id.* ¶¶ 21, 23. Without a working toilet, Mr. Hagans is forced to urinate in his sink, where he also washes his clothes and brushes his teeth. *Id.* ¶¶ 22. Mr. Hagans was also provided spoiled milk, which caused severe intestinal issues that were not properly treated.

*Id.* ¶¶ 24–25.  Mr. Hagans continues to suffer under these unsanitary and inhumane conditions despite not having been found guilty of any criminal conduct or any violation of supervision, and despite three federal judges ordering his release.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts in this Circuit have traditionally applied these factors on a "sliding scale," where a stronger showing on some factors can compensate for a weaker showing on others.  *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999).  The Circuit has suggested, but not decided, that an independent showing of likelihood of success is required.  *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20–22).  Under either approach, Plaintiff makes the necessary showing here.

## ARGUMENT

### I.    Likelihood of Success on the Merits

#### A.  The Non-Detention Act Precludes Pre-Revocation Detention.

As an initial matter, Defendants lack the authority to detain individuals awaiting a revocation hearing whether or not an individualized determination on detention takes place.  In 1971, Congress enacted the following law: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."  18 U.S.C. § 4001(a).  This law—known as the Non-Detention Act—prohibits the detention of a United States citizen without statutory authorization.  As courts have explained, Congress must use "precise and specific language authorizing the detention of American citizens" in order to "override [the Non-Detention

15

Act's] prohibition." *Padilla v. Rumsfeld*, 352 F.3d 695, 720 (2d Cir. 2003), *rev'd and remanded on other grounds*, 542 U.S. 426 (2004); *see also Howe v. Smith*, 452 U.S. 473, 479 n.3 (1981) (explaining that the Non–Detention Act "proscrib[es] detention of *any kind* by the United States, absent a congressional grant of authority to detain") (emphasis in original)).

In a similar context, a District Court rejected the notion that a federal court—let alone a federal agency—has the requisite authority under "some Act of Congress" as required by the Non-Detention Act to detain an individual pending a supervised release revocation. *See United States v. Mercado*, No. 3:13-cr-181, __ F. Supp. 3d __, 2025 WL 297429, at *1 (D. Conn. Jan. 24, 2025). In *Mercado*, the Court held that neither 18 U.S.C. § 3143(a) (the statute governing judicial officers' authority with respect to "release or detention pending sentence") nor Fed. R. Crim. P. 32.1(a)(6) (the Rule governing magistrate judge authority over release and detention pending supervised release and probation revocation) provided that authority. *Id.* at *2, *6–7. And while some courts have found the requisite authority is granted by either 18 U.S.C. § 3143(a) or Fed. R. Crim. P. 32.1(a)(6)—provisions that apply to judicial determinations and do not relate to the Commission's authority—they have agreed that the Non-Detention Act requires that pre-revocation detention be authorized by Congress.

Here, Congress has not authorized the Parole Commission to detain individuals prior to revoking their supervised release. In 1997, Congress delegated to the Parole Commission authority over people on supervised release, including decisions regarding revocation. That delegation is codified at D.C. Code § 24-133(c)(2), which states that individuals on supervised release for D.C. Code offenses "shall be subject to the authority of the United States Parole Commission until completion of the term of supervised release." The D.C. Code itself does not elaborate on what that authority entails. Instead, it states that the "United States Parole Commission shall have and

16

exercise the *same authority* as is vested in the United States district courts by paragraphs (d) through (i) of § 3583 of title 18[.]" *Id.* (emphasis added). Those paragraphs thus comprise the Parole Commission's specific authority over individuals on supervised release for D.C. Code offenses.

But paragraphs (d) through (i) of 18 U.S.C. § 3583 do not authorize the Parole Commission to detain someone before their supervised release has been revoked. In fact, they are completely silent on the issue of pre-revocation detention. *See Mercado*, 2025 WL 297429, at *7 (holding that although § 3583(e) "grants district courts the authority to modify or revoke a term of supervised release," it "makes no mention of authority to detain a person before a revocation has been ordered"). By contrast, they do authorize the Parole Commission to detain someone *after* their supervised release has been revoked. *See* 18 U.S.C. § 3583(i) (describing the "power of the court to revoke a term of supervised release for violation of a condition of supervised release, and to order the defendant to serve a term of imprisonment"). Without specific Congressional authorization, the United States Parole Commission lacks authority to "imprison[] or otherwise detain[]" class members when it has not revoked their supervised release. 18 U.S.C. § 4001(a).

### B. Due Process Requires Individualized Determinations for Pre-Revocation Detention.

Mr. Hagans and members of the putative class are also likely to succeed on their due process challenge. The Fifth Amendment's Due Process Clause provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Due process, at its core, protects individual liberty from "arbitrary" government action. *See Cty. Of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) ("We have emphasized time and again that [t]he touchstone of due process is protection of the individual against arbitrary action of government.") (quotations and citation omitted). Arbitrary conduct that violates this principle can be assessed in

two ways: (1) procedural due process, where "the fault lies in a denial of fundamental procedural fairness," and (2) substantive due process, where the government's conduct infringing on someone's liberty interest is "without any reasonable justification in service of a legitimate governmental objective." *Id.* at 845–46.

Defendants' mechanical detention of every person pending a revocation proceeding violates both. The policy violates procedural due process because it deprives Mr. Hagans and class members of their interest in being free from confinement without *any* process on the issue of detention. The Commission's policy allows no viable opportunity to contest detention, nor do Defendants make any individualized determination that such detention is necessary. Defendants' act of jailing Mr. Hagans and other class members pursuant to this automatic detention policy also violates their substantive due process rights because the policy results in arbitrary detention, unjustified by any compelling government objective. While Mr. Hagans does not dispute the government's general interest in ensuring community safety and attendance at future hearings, this interest does not justify an overbroad policy of *automatic* detention pending revocation without an individualized assessment. Indeed, people facing revocation include those charged with technical violations of release, which are often minor allegations not suggestive of flight risk or dangerousness, as well as those, like Mr. Hagans, for whom judges found detention unnecessary. Thus, being accused of violating conditions of release is not a "convincing proxy for unmanageable flight risk or dangerousness," *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 786 (9th Cir. 2014), and yet is the *only* prerequisite for detention under Defendants' unlawful scheme.

### i.    Mr. Hagans' and Putative Class Members' Liberty Interests Are Great.

As an initial matter, due process principles apply with significant force to those on supervised release, given their interest in remaining in the community following the completion of their prison term. Before supervised release was created, the Supreme Court recognized the due

process rights implicated when someone on probation or parole faces revocation: "[T]he whole thrust of the probation-parole movement is to keep men in the community, working with adjustment problems there, and using revocation only as a last resort when treatment has failed or is about to fail." *Gagnon v. Scarpelli*, 411 U.S. 778, 785 (1973). When pronouncing the "minimum requirements of due process" in this context, the Supreme Court made clear that their liberty interest "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Morrissey v. Brewer*, 408 U.S. 471, 488–89 (1972); *see also Gagnon*, 411 U.S. at 782 (applying *Morrissey* to probation). While the Supreme Court has not opined on the due process rights of those pending revocation for supervised release, the purpose and history of supervised release make clear that their liberty interests are even greater than those held by people pending revocation of probation and parole.

As discussed *supra*, both probation and parole are part of an individual's term of imprisonment, and are served in lieu of incarceration prior to the completion of an individual's prison sentence. Parole is a conditional release from incarceration "before the end of [a] prison sentence." *Morrissey*, 408 U.S. at 483. A "prisoner" on parole "is deemed to be continuing to serve the original sentence imposed" and if he violates a condition of parole may be required to serve "the unexpired term of imprisonment." *Fowler v. U.S. Parole Comm'n*, 94 F.3d 835, 839 (3d Cir. 1996). Probation, similarly, is a type of sentence imposed in lieu of imprisonment, and the Supreme Court has described it as an "act of grace" allowing the individual to serve a portion of a sentence in the community. *Escoe v. Zerbst*, 295 U.S. 490, 492 (1935). In contrast, "supervised release wasn't introduced to replace a portion of the defendant's prison term, only to encourage rehabilitation *after the completion of his prison term*," *Haymond*, 588 U.S. at 652

(emphasis added), and it thus "fulfills rehabilitative ends, distinct from those served by incarceration," *United States v. Johnson*, 529 U.S. 53, 59 (2000).

The non-punitive nature of supervised release, which "in contrast to probation, is not a punishment in lieu of incarceration," *United States v. Granderson*, 511 U.S. 39, 50 (1994), is enshrined in the law.  Notably, Congress omitted retributive factors from the list of factors that should be considered when imposing or revoking supervised release.  The retributive factors, which courts may consider at sentencing, include "the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment[.]"  18 U.S.C. § 3553(a)(2)(A).  Congress determined that these factors are an appropriate consideration when imposing or revoking probation.  18 U.S.C. §§ 3562(a), 3565(a).  But Congress explicitly omitted this very provision from the list of factors courts are to consider when imposing and revoking supervised release.  *See* 18 U.S.C. § 3583(c), (e); D.C. Code § 24-403.01(b)(6) (applying 18 U.S.C. § 3583(d)-(i) to people in D.C. on supervised release).  This is because, unlike in probation and parole, an individual on supervised release has already completed a prison term, which fulfills the need for retributive punishment.  Thus, while everyone who is released from prison has a liberty interest in remaining in the community, that interest is particularly robust for those on supervised release, who have completed the entire prison term they were given, and whose supervision "fulfills rehabilitative [rather than punitive] ends."  *Haymond*, 588 U.S. at 652.

### ii.    Mr. Hagans' and Putative Class Members' Detention Violates Procedural Due Process.

The loss of liberty resulting from pre-revocation detention is a serious deprivation of liberty and triggers procedural safeguards.  *C.f. Morrissey*, 408 U.S. at 482 (explaining that, in the context of parole, "the liberty [of a parolee] is valuable and must be seen as within the protection of the Fourteenth Amendment"); *Gagnon*, 411 U.S. at 781–82 (applying *Morrissey* to probation).  Courts

assessing procedural due process weigh three factors outlined by the Supreme Court in *Mathews v. Eldridge*: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the value of "additional or substitute procedural safeguards," and (3) the "public interest." 424 U.S. 319, 335, 347 (1976). Here, each of the *Mathews* factors weigh in class members' favor.

*Plaintiffs' liberty interests are significant.* Detention at the Jail pursuant to an alleged violation of supervised release results in a "serious deprivation" of liberty. *C.f.*, *Gagnon*, 411 U.S. at 781. The Supreme Court has found that people on parole and probation have a significant liberty interest in avoiding confinement, triggering due process protections. *Morrissey*, 408 U.S. at 488–89; *Gagnon*, 411 U.S. at 782. These interests are even greater for people on supervised release who, unlike those on probation and parole, have already completed their prison term. *See supra* at 18–20.

The Commission's policy of jailing people on supervised release pending revocation thus implicates this core liberty interest, at great cost to the individuals' reintegration to the community. Indeed, even a short period of detention "often means a loss of a job; it disrupts family life, and it enforces idleness." *Barker v. Wingo*, 407 U.S. 514, 532 (1972). Mr. Hagans, for example, has been separated from his family, including his mother who feels unsafe living without him. His jailing has also further disrupted his efforts to find employment, a task that is already difficult enough for someone on supervised release who has a criminal conviction on their record. And he is being jailed at the D.C. Jail, where he often has no running water, lives in a cell that frequently is flooded with sewage, and has had sporadic access to medical care. Ex. A, Hagans Decl. ¶¶ 17–28.

*The risk of erroneous deprivation is great.*  The risk of erroneous deprivation—the second *Mathews* factor—is great.  People accused of violating their supervised release are erroneously incarcerated if pre-hearing detention is unnecessary due to a lack of flight risk or danger to the community.  By automatically detaining people on supervised release pending their revocation hearing, Defendants guarantee that they are erroneously incarcerating individuals.  Indeed, even if probable cause exists to believe someone violated a condition of supervised release, that certainly does not mean their detention pending a revocation hearing is necessary.  In Mr. Hagans' case, for example, numerous federal judges have found that he need not be detained at the Jail prior to a determination of the merits of the charge against him.  Nonetheless, Defendants have jailed him— not pursuant to any assessment or belief of his dangerousness or flight risk, but rather due to an automatic detention policy that takes no account whatsoever of whether such detention is necessary.

*There is no public interest in Defendants' automatic detention policy.*  The third *Mathews* factor requires consideration of the government's interest, including "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," as well as "other societal costs."  *Mathews*, 424 U.S. at 335, 347.  Virtually no burden is imposed by a requirement that an agency justify its decision to jail an individual.  Indeed, pre-revocation hearing detention determinations are routine—they are the norm in the federal system for individuals facing revocation of supervised release or probation, as well as for people facing revocation of probation in Washington, D.C.  *See supra* at 8–11.  Defendants' conduct here— applying an automatic detention policy to people accused of violating a condition of supervised release—is thus an anomaly that courts have not had occasion to review.

Significantly, the administrative burdens associated with pre-revocation custody determinations are minimal.  Defendants already hold a probable cause hearing at which the individual on supervised release and their attorney are present, and at which release arguments are made.  The law and Defendants' own manual already contemplate a procedure by which people may be given a summons to appear at their revocation hearing from the community.  18 U.S.C. § 4214(a)(1)(A) (providing for pre-hearing release where the Commission finds "incarceration . . . pending further revocation proceedings is not warranted by the alleged frequency or seriousness of such violation or violations," and the individual is not a flight risk or a danger); Ex. H, U.S. Parole Commission Rules & Procedures Manual § 2.211-02 (same).  The Commission's probable cause hearing digests include a check-box that an examiner can select when recommending release pending a revocation hearing following a finding of probable cause.  *See* Ex. G, United States Parole Commission: D.C. Probable Cause Hearing Digest.  And until several years ago, Defendants did, in fact, employ such a system and allow people to await their revocation hearing in the community.  Ex. B, Epps Decl. ¶¶ 6–7.

In a somewhat similar context, the Seventh Circuit addressed a state's mandatory detention law as to people facing revocation of parole.  *Faheem-El v. Klincar*, 841 F.2d 712, 725 (7th Cir. 1988) (en banc).  The court recognized that the liberty interests of the parolee "should not be underestimated," and that the state and parolees "have a similar interest in avoiding inappropriate detention of parolees pending their final revocation hearing."  *Id.* at 725–26.  As a result, procedures that "do not provide an individualized evaluation" of the appropriateness of detention pending a revocation hearing "'smacks of arbitrariness.'"  *Id.* at 726 (quoting *Faheem-El v. Klincar*, 620 F. Supp. 1309, 1319 (N.D. Ill. 1985)).  Ultimately, the Seventh Circuit was unable to make a determination about what additional process was due because there was no evidence in the

23

record about the burden the parole board would face if required to hold "release suitability hearings." *Id.* at 726–27. The court remanded the case, but the parties settled and entered into a consent decree requiring that people accused of parole violations receive an individualized evaluation of their suitability for release pending their final revocation hearing. Here, by contrast, no such barrier to reaching the merits exists because it *is* clear that the burdens the Parole Commission would face if required to make pre-revocation custody determinations are minimal.

In contrast, the societal costs of detaining everyone pending revocation—including those for whom detention is unnecessary—are great. As a general matter, detention at the Jail "comes at a cost [to taxpayers]." *United States v. McLean*, 749 F. Supp. 3d 167, 169 n.1 (D.D.C. 2024). "[T]he human costs are not so easily calculated." *Id.* For the people on supervision, detention can interrupt their rehabilitation, expose them to dangerous conditions of confinement, and separate them from their community and family. And these harms extend throughout society. As the Supreme Court has explained, an individual on supervision "is not the only one who has a stake in his [] liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law." *Morrissey*, 408 U.S. at 484; *see also Gagnon*, 411 U.S. at 785 (highlighting the public interest in not "interrupting a successful effort at rehabilitation").

In sum, Mr. Hagans and members of the putative class have enormous liberty interests at stake; the risk of erroneous deprivation of that interest is great—particularly where, as here, three federal judges have already confirmed that Mr. Hagans' detention at the Jail is unnecessary; and there is no public interest in jailing class members through an automatic detention policy without any consideration of whether detention is necessary. Mr. Hagans and class members have a clear right to a basic procedural safeguard providing an opportunity to seek release, and Defendants

must make an individualized determination that detention is necessary prior to jailing them until their revocation hearing.

### iii.    Mr. Hagans' and Putative Class Members' Detention Violates Substantive Due Process.

The due process clause also "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (internal quotation marks and citation omitted). Like procedural due process, substantive due process entails balancing an individual's "liberty interests against the relevant state interests." *Youngberg v. Romero*, 457 U.S. 307, 321 (1982).

Two separate and interrelated standards inform this balancing in the context of pre-adjudication detention. The first is the general due process principle that, where the government infringes on a fundamental right, such as liberty, the infringement must be "carefully limited to serve a compelling governmental interest." *Lopez-Valenzuela*, 770 F.3d. at 777; *see also United States v. Salerno*, 481 U.S. 739, 748 (1987). Second, a law violates substantive due process where it imposes punishment prior to a determination of the merits. *Bell v. Wolfish*, 441 U.S. 520 (1979). Whether "punishment" in the constitutional sense has been imposed requires assessing whether the restriction on someone's liberty "appears excessive in relation to" the government's purported non-punitive goal. *Salerno*, 481 U.S. at 747. Here, Defendants' conduct violates both standards.

*The Policy is Not Narrowly Tailored to a Compelling Governmental Interest.* "The Due Process Clause . . . provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997). Among these "fundamental rights," of course is "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint," which "lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "Freedom from bodily

restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *see also Salerno*, 481 U.S. at 755 ("[L]iberty is the norm, and detention prior to trial or without trial is the carefully limited exception.").

Given these constitutionally enshrined liberty protections, "the institutionalization of an adult by the government triggers heightened, substantive due process scrutiny." *Reno v. Flores*, 507 U.S. 292, 316 (1993) (O'Connor, J. and Souter, J., concurring).  This means that the government may not deprive someone of their fundamental liberty interest unless it is "reasonably necessary," meaning where it is "narrowly tailored to serve a compelling government interest." *United States v. Myers*, 426 F.3d 117, 126 (2d Cir. 2005); *see also United States v. Loy*, 237 F.3d 251, 256 (3d Cir. 2001) ("[A] condition that restricts fundamental rights must be narrowly tailored and directly related to deterring the defendant and protecting the public." (cleaned up)).  This assessment requires consideration of both the goal of the government's conduct, and whether that conduct "represents a greater deprivation of liberty than is necessary to achieve that goal." *Myers*, 426 F.3d at 126; *see also Goings v. Court Services and Offender Supervision Agency for D.C.*, 786 F. Supp. 2d 48, 68 (D.D.C. 2011) ("The Due Process Clause includes a 'substantive component, which forbids the government to infringe certain fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" (quoting *Reno*, 507 U.S. at 301–02)).

Categorical rules resulting in the detention of a group of people without an individualized assessment rarely, if ever, survive this scrutiny.[7]  Indeed, such a rule "would have to be carefully

---

[7] In the last century, the Supreme Court has upheld mandatory detention schemes in only two narrow circumstances: the first involves the mandatory detention of non-citizens during war, and the second involves the mandatory detention of a narrow group of non-citizens during deportation

limited" to pass constitutional muster, and "[t]he state's chosen classification would have to serve as a convincing proxy for unmanageable flight risk or dangerousness." *Lopez-Valenzuela*, 770 F.3d. at 786.  While probable cause "is a prerequisite to extended restraint of liberty following arrest," *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975), it does not alone justify detention until a hearing without additional process.  *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006) (noting that in *Salerno*, 481 U.S. at 750, the Supreme Court "upheld the constitutionality of a bail system where pretrial defendants could be detained only if the need to detain them was demonstrated on an individualized basis.").  As the Seventh Circuit explained, there is a "substantial difference between the determination that there is probable cause to believe a condition of parole has been violated (the issue at the preliminary revocation hearing) and a determination that an individual should be detained pending his or her final revocation hearing." *Faheem-El*, 841 F.2d at 725.  Given the risk of unnecessary incarceration resulting from overly broad detention schemes, due process requires some individualized determination of the necessity of detention in order to deprive someone of their liberty.  Otherwise, the action is far from narrowly tailored to the government's aim.

Should there be any doubt, these protections extend beyond the traditional context of criminal proceedings.  "Conditions of supervised release or probation that implicate fundamental liberty interests" must be "narrowly tailored to serve a compelling state interest." *Goings*, 786 F. Supp. 2d at 68; *see also Myers*, 426 F.3d at 126 (explaining that a supervised release condition "that restricts a fundamental liberty interest" must be "narrowly tailored to serve a compelling

_____

proceedings. *See Ludecke v. Watkins*, 335 U.S. 160 (1948) (upholding the unreviewable executive power under the Alien Enemy Act to detain enemy aliens in time of war); *Demore v. Kim*, 538 U.S. 510, 513 (2003) (upholding the mandatory detention of immigrants who concede they are deportable based on certain criminal convictions for the brief period necessary for removal proceedings).

government interest"). In the similar context of civil detention of people with mental illness, the Supreme Court held that an individualized evaluation of the person's illness and the safety risk to the community was necessary to justify commitment to a mental hospital. *Addington v. Texas*, 441 U.S. 418 (1979). And in juvenile court, courts require individualized evaluations of the appropriateness of detention as to children, even though they have reduced liberty interests as they are "always in some form of custody," unlike adults. *Schall v. Martin*, 467 U.S. 253, 265 (1984).

The cases of *Salerno* and *Lopez- Valenzuela* illustrate the constitutional concerns with rules that result in detention on a categorical basis. In *Salerno*, the Supreme Court found that a law permitting pretrial detention in serious felony cases was constitutional because it did not categorically deny release, but rather permitted detention when the government showed by clear and convincing evidence that detention was necessary due to a flight risk and community safety. Indeed, the law required a "full-blown adversary hearing," and was "narrowly focuse[d]" by applying only to "a specific category of extremely serious offenses." *Salerno*, 481 U.S. at 750. Conversely, in *Lopez-Valenzuela*, the Ninth Circuit found that a law did not survive due process scrutiny when it mandated the setting of bail for certain felony offenses for anyone who had entered or remained in the United States illegally. 770 F.3d at 791. The law was not "carefully limited" to any interest in ensuring attendance at trial because it categorically denied release to people based on their undocumented status. *Id.* at 777, 782. The law encompassed "an exceedingly broad range of offenses, including not only serious offenses but also relatively minor ones." *Id.* at 784. By "employ[ing] an overbroad, irrebuttable presumption rather than an individualized hearing to determine whether a particular arrestee poses an unmanageable flight risk," the law was "not narrowly focused on those arrestees who actually pose the greatest flight risk." *Id.* at 784–85.

Defendants' automatic detention of everyone pending a revocation hearing is even less tailored to any legitimate interest than the law in *Lopez-Valenzuela*. Defendants' policy is not driven by any identified concern in flight risk or public safety. *See Salerno*, 481 U.S. at 750. Plaintiff does not challenge a general interest in the safety of the community or ensuring someone's presence for a hearing. But there can be no interest in the automatic detention of *everyone* pending a revocation hearing, without any assessment of whether they actually pose such risks. Such a practice impermissibly "employs an overbroad, irrebuttable presumption rather than an individualized hearing to determine whether a particular arrestee poses an unmanageable flight risk." *Lopez-Valenzuela*, 770 F.3d at 784. Just as the category of undocumented immigrants was not a "convincing proxy for unmanageable flight risk or dangerousness," neither is the category of people alleged to have violated a condition of release. *Id.* at 786. Indeed, many people pending revocation hearings are accused of minor and non-violent offenses, or only technical violations. And many, if assessed individually, would be determined to be neither a flight risk nor a danger. In Mr. Hagans' case, for example, *three* federal judges determined that such risks did not necessitate his detention. But because of Defendants' automatic detention policy, he had no opportunity to be considered for release, let alone a "full-blown adversary hearing." *Id.* at 784.

In short, Defendants have employed an automatic policy requiring detention that is not justified by any legitimate or compelling interest they have in community safety and ensuring individuals' attendance at hearings. By detaining everyone, regardless of the risks and the appropriateness of their detention, Defendants employ precisely the type of overbroad and arbitrary policy that infringes on Plaintiffs' liberty interest and violates due process. *See id.* at 791.

*The Policy Results in Unconstitutional Punishment.* As the merits of the charges against Mr. Hagans and the putative class have not yet been adjudicated, they are entitled to be free from

detention that "amount[s] to punishment." *Bell*, 441 U.S. at 536–37.  Under *Bell*, whether detention is punitive in the constitutional sense is established "by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (quoting *Bell*, 441 U.S. at 561); *see also Lopez -Valenzuela*, 770 F.3d at 791 (finding a bail provision punitive where there was a "lack of fit between the asserted nonpunitive purpose and the actual operation of the law").  If it is not—if the pre-adjudication detention is "arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees." *Bell*, 441 U.S. at 539.

The government violates this principle and imposes "arbitrary or purposeless" detention where it jails people prior to an adjudication of the merits without finding that they pose any sort of safety or flight risk justifying detention.  The Supreme Court has "upheld preventive detention based on dangerousness only when limited to specially dangerous individuals and subject to strong procedural protections." *Zadvydas*, 533 U.S. at 690–91.  For example, in *Schall*, the Supreme Court found that a New York law was not punitive where it permitted the detention of children only after an individualized finding of "serious risk" that the child "may before the return date commit an act which if committed by an adult would constitute a crime." 467 U.S. at 255.  Unlike the automatic detention policy at issue here, a judge applying the law in *Schall* must, in addition to finding probable cause, "determine whether continued detention is necessary." *Id.* at 270.  Moreover, any detention deemed "necessary" under that scheme is short-lived, generally lasting "not more than 14 days" or "three days" following the initial appearance, depending on the charges. *Id.* at 270, 278.

30

By contrast, in *Zadvydas*, the Supreme Court rejected an interpretation of federal law that would permit the detention of non-citizens pending deportation even when deportation was no longer reasonably foreseeable. 533 U.S. at 699. The detention scheme was impermissible because it did "not apply narrowly to a small segment of particularly dangerous individuals . . . but broadly to [individuals] ordered removed for many and various reasons, including tourist visa violations." *Id.* at 691. The only common denominator among these individuals was their removable status, "which bears no relation to a detainee's dangerousness." *Id.* at 692. And the "sole procedural protections available" were administrative proceedings where the detained individual bore "the burden of proving he is not dangerous." *Id.*

Defendants' mandatory detention policy is excessive in relation to any reasonable governmental goal and thus constitutes unconstitutional punishment. Defendants do not jail individuals pending revocation of supervised release pursuant to any determination of dangerousness or flight risk. Indeed, everyone pending a revocation hearing is detained, regardless of the severity of the initial offense, the new allegations, or flight risk, and even in cases like Mr. Hagans', where judges have found that no such risks exist. Rather, people pending revocation hearings are jailed solely because they have been accused of violating their conditions of supervised release. This type of punishment is impermissible, where class members have not been found to have committed any violation worthy of punishment. *See Bell*, 441 U.S. at 535 ("[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). This is particularly clear for someone on supervised release, for whom punishment and retribution are not available goals in revocation proceedings. *See supra* at 20.

### C. Applicable Law Compels Individualized Determinations for Pre-Revocation Detention.

In addition to being required by due process, applicable law compels individualized determinations for pre-revocation detention.  Any purported authority the U.S. Parole Commission has to detain individuals on supervised release for a D.C.-code offense pending their revocation hearing would be constrained by the regulation and statute governing the Commission's procedures, which direct the Commission to consider several enumerated factors.  "With respect to offenders serving terms of supervised release imposed by the Superior Court of the District of Columbia," "the procedures followed by the [Parole] Commission in exercising [its] authority shall be those set forth with respect to offenders on federal parole at 18 U.S.C. 4209 through 4215."  28 C.F.R. § 2.200.  18 U.S.C. § 4214(a)(1)(A), in turn, states that any alleged violator shall be accorded the opportunity to have a preliminary hearing, and "after a finding of probable cause the Commission may restore any parolee to parole supervision if . . . incarceration of the parolee pending further revocation proceedings is not warranted by the alleged frequency or seriousness of such violation or violations" and the individual is "not likely to fail to appear for further proceedings" and "does not constitute a danger to himself or others."  The applicable regulations outline the same factors that the Commission should consider when "order[ing] the releasee's . . . release pending further proceedings" "notwithstanding a finding of probable cause."  28 U.S.C. § 2.214(g).  This language mirrors similar statutes that courts have read to require consideration of the action the government "may" take—here, release pending a revocation hearing.

Section 4214 and the Commission's regulation, 28 U.S.C. § 2.214(g), instruct that the Commission consider individual circumstances to justify whether incarceration or release is appropriate after finding probable cause exists for the alleged violation.  *Sherman v. U.S. Parole*

*Comm'n*, 502 F.3d 869, 881 (9th Cir. 2007) (explaining that a purpose of the preliminary hearing is to determine "whether *circumstances* justify incarceration of the [individual on supervision] pending further revocation proceedings, *among other options*." (emphases added)).  Congress was additionally clear when establishing the U.S. Parole Commission that the determination of "whether or not there is sufficient cause to detain [a parolee]" was a significant part of the preliminary hearing because "a new period of incarceration, even if only 24 hours in length, may cost a parolee his employment, and further jeopardize his chances for rehabilitation."  S. Rep. No. 94-369, at 339 (1975).  Therefore, "the detention of an alleged violator is a serious matter and must be dealt with in a manner which clearly recognizes the degree of loss to be suffered."  *Id.*  To have a "blanket policy" "holding all suspected violators in custody" until a "full determination" of the alleged violation is made "[does] injustice at wholesale."  *U. S. ex rel. Napoli v. State of N. Y.*, 379 F. Supp. 603, 606 (E.D.N.Y. 1974).

Although the language of § 4214 gives the Commission discretion in how to apply factors (ii)-(iv), it does not give the Commission discretion to *forgo* the determination entirely.  *Luther v. Molina*, 627 F.2d 71, 76 (7th Cir. 1980) (describing that a habeas corpus petition "might properly be granted" with a "showing that the Commission is not exercising its discretion at all").  In other words, the Commission "abuse[d] the discretion statutorily conferred upon it" when it refused to "actually exercise[]" that discretion.  *Rodriguez v. Herrera*, 72 F. Supp. 2d 1229, 1232 (D. Colo. 1999) (internal citation omitted).  In *Rodriguez*, two individuals filed habeas corpus petitions challenging the Bureau of Prison ("BOP")'s refusal to consider them for a sentence reduction under the applicable statute, which states that "[t]he period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prison . . ."  *Id.* (quoting 18 U.S.C. § 3621(e)(2)(B)).  The court ordered that the

BOP consider the petitioners for a reduction if they had completed a qualifying program, and it prohibited the BOP from "declaring itself unable or unwilling to consider [] the discretionally relief conferred" by the statute. *Rodriguez*, 72 F. Supp. 2d at 1232. Similarly, § 4214 states that the Commission "may restore any parolee to parole supervision" if "incarceration of the parolee pending further revocation proceedings is not warranted." As the court held in *Rodriguez*, the Commission cannot declare itself unable or unwilling to exercise this statutorily conferred discretion by employing a mechanical rule of automatic detention. *See also United States v. Mooney*, 654 F.2d 482, 487 (7th Cir. 1981) ("Had the district court followed a purely mechanical policy of sentencing defendants to maximum terms with no consideration for individual circumstances, it would have abdicated its responsibility actually to exercise its discretion."). The same principle applies in other contexts. *See Mergentime Corp. v. Washington Metro. Area Transit Auth.*, 166 F.3d 1257, 1263 (D.C. Cir. 1999) ("Although district courts enjoy wide discretion to grant or deny post-trial motions, *see Hutchinson v. Stuckey*, 952 F.2d 1418, 1420 (D.C. Cir. 1992), they cannot refuse to exercise that discretion."); *Ghanayem v. Holder*, 555 F. App'x 611, 613 (7th Cir. 2014) (describing that agencies are not permitted to refuse to "exercise any discretion at all," to "completely ignore[] evidence put forth by a petitioner," or "fail[] . . . to address arguments raised.").

In the analogous process for supervised releasees pending revocation in federal court, the judge "may release" a person pending further proceedings upon finding the person "will not flee or pose a danger to any other person or to the community." Fed. R. Crim. P. 32.1(a)(6). This language mirrors the language of 18 U.S.C. § 4214 that the Commission "may restore any parolee to parole supervision" if further incarceration is not warranted and the individual is "not likely to fail to appear" and "does not constitute a danger to himself or others." And courts have made clear

that Rule 32.1(a)(6) requires judges to make an individualized determination of a person's eligibility for release. *United States v. Loya*, 23 F.3d 1529, 1531 (9th Cir. 1994) ("the district court *shall* determine the person's eligibility for release under the standards set forth in [the applicable statute]." (emphasis added)).    Likewise, the individualized determination here requires consideration of the criteria outlined in 18 U.S.C. § 4214, and the Parole Commission is failing to determine a person's eligibility for release per this standard.

Rather than exercising its discretion to make the required individualized finding, the Commission automatically detains supervised releasees pending their revocation proceedings, ignoring a critical step of the preliminary hearing laid out in § 4214.  Ex. B, Epps Decl. ¶¶ 5–6.  At no time during Mr. Hagans' preliminary hearing was there a consideration of his likelihood to fail to appear for further proceedings or the danger he presents to himself or others, per the standard in 18 U.S.C. § 4214.  *See* Ex. G, United States Parole Commission: D.C. Probable Cause Hearing Digest.  This automatic detention decision meant Mr. Hagans' continued detention at the D.C. Jail, where he has experienced deplorable conditions, including no running water, spoiled food, untreated illness, and sewage flooding his cell.  Ex. A, Hagans Decl. ¶¶ 15–30.  The Parole Commission's automatic detention policy nullifies Congress's intent that the detention of an alleged violator be dealt with in a manner that recognizes the severity of the loss of liberty.

Finally, because the statutory scheme includes factors that the Commission should consider when determining who to release pending further revocation proceedings, 18 U.S.C. § 4214(a)(1)(A)(i-iv), some individuals will necessarily be "entitled to release."  *United States v. Latimer*, 991 F.2d 1509, 1517 (9th Cir. 1993); *see also Bailey v. U.S. Parole Comm'n*, 769 F. Supp. 1025, 1029 (N.D. Ill. 1991) (noting that the Parole Commission considered the "criteria" of 18 U.S.C. § 4214 when upholding the Commission's determination regarding imprisonment

pending revocation).  In *U.S. ex rel. Hebel v. Luther*, the court applied the "requirements" of § 4214 to overturn the Parole Commission's decision to deny the petitioner's request for release pending further revocation proceedings.  544 F. Supp. 179, 181 (N.D. Ill. 1982).  The court considered that the petitioner was not likely to fail to appear for further proceedings, nor was he a danger to himself or others, as he had community and family connections, had housing with his mother, was employed, and had indications of stability and support.  *Id.* at 182.  Had the Parole Commission completed the required determination regarding Mr. Hagans' individual circumstances when he requested his release pending further proceedings, it would have learned he had an upcoming job fair and appointment with a community organization, has housing with his mom, has several supportive family members in Washington, D.C., and is the primary caretaker of his beloved dog. Ex. A, Hagans Decl.  ¶¶ 7, 10, 12, 32, 33.  These are exactly the types of circumstances that are relevant to a determination of release or detention under § 4214.  But Defendants ignored them, and made no individualized findings regarding whether pre-revocation detention was appropriate, per the criteria laid out in 18 U.S.C. § 4214.  By not exercising their discretion as outlined in the law, Defendants violate the terms of any purported authority under which they detain Mr. Hagans and other members of the putative class.

### D. The Commission's Automatic Detention Policy Violates the Equal Protection Clause.

The Fifth Amendment precludes the federal government from treating similarly situated parties differently for no rational reason.  *See 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003); *Fraternal Order of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998) ("Equal protection analysis is substantially identical under the Fifth Amendment and the Fourteenth."), *reh'g granted on other grounds*, 173 F.3d 898 (D.C. Cir. 1999).  "[A] situation[] in which a parolee detained during revocation proceedings might properly be granted

habeas corpus relief, including bail . . . would be a claim that it would violate equal protection to deny bail to parolees awaiting revocation while making it available to probationers." *Luther*, 627 F.2d at 76.

Proposed class members—people on supervised release for D.C. Code offenses—are similarly situated to people on probation for D.C. Code offenses and people on supervised release and probation for federal offenses. The similarly situated standard does not require that two groups be the same in *all* aspects, only in "all of the *relevant* aspects." *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (emphasis added). As discussed above, supervised release and probation are distinct in that "supervised release is a form of post-imprisonment supervision while probation is supervision in lieu of incarceration." *United States v. Gaskell*, 134 F.3d 1039, 1044 (11th Cir. 1998) (internal quotations omitted). The purpose of supervised release is rehabilitative, while probation may be issued and revoked for retributive reasons. *See supra* at 3–5.

Although different in terms of purpose and the liberty interests they create, these forms of supervision are similarly situated in aspects relevant to the day-to-day operation of their supervision, and the procedures and consequences of revocation. "Both probation and supervised release are discretionary and conditional, involve government supervision, and make a person subject to incarceration upon revocation." *Gaskell*, 134 F.3d at 1044. Had proposed class members been convicted in the federal system or put on D.C. probation, they would not be subjected to the "greater impairment of [their] asserted liberty interest" that results from the Parole Commission's automatic detention policy. *Clymer v. City of Adelanto,* No. 16-cv-2535, 2017 WL 10592143, at *10 (C.D. Cal. Apr. 20, 2017) (concluding the plaintiff, an individual on supervised

release, was similarly situated to those on probation when evaluating the validity of a condition of his release).

Furthermore, the language providing the process for release versus incarceration pending further revocation proceedings is similar for all three groups within the relevant statutes and guidelines. For class members, the law governing the Commission's procedures states that "the Commission may restore any parolee to parole supervision if . . . incarceration of the parolee pending further revocation proceedings is not warranted by the alleged frequency or seriousness of such violation or violations" and the individual is "not likely to fail to appear for further proceedings" and "does not constitute a danger to himself or others." 18 U.S.C. § 4214. For those on federal supervised release and probation, Fed. R. Crim. P. 32.1(a)(6) states the judge "may release" a person pending further proceedings upon finding the person "will not flee or pose a danger to any other person or to the community." For those on probation for D.C.-code offenses, "the court may release or detain the person," Super. Ct. Crim. R. 32.1(1)(C), after considering the individual's likelihood to "flee or pose a danger to any other person or to the property of others," D.C. Code § 23-1325(b). In all three schemes, the language is nearly identical and outlines the same set of criteria by which the government may release an individual pending further revocation proceedings.

Yet, the government treats these groups differently. Pre-hearing release is granted to individuals on probation for D.C. Code offenses and individuals on supervised release and probation for federal offenses. For class members—those on supervised release for D.C. Code offenses—this pre-hearing release is unavailable due to the government's automatic detention policy that does not consider whether detention is appropriate in individual cases. *See* Ex. B, Epps Decl. ¶ 5. In the last five years, the Parole Commission has only released *two* people on D.C.

38

supervised release pending their further revocation proceedings; and in nearly two years has released no one pending further revocation proceedings. Ex. B, Epps Decl. ¶ 6.

Because these groups are similarly situated, their disparate treatment must be "rationally related to a legitimate state interest." *Fraternal Ord. of Police, Metro. Police Dep't Lab. Comm., D.C. Police Union v. D.C.*, 45 F.4th 954, 958 (D.C. Cir. 2022). There is no rational basis for depriving class members of consideration for pre-revocation hearing release that is afforded to similarly situated people on probation and federal supervised release. If one group "may be so privileged" to have the right to release pending revocation hearings, "then so must the other." *U.S. ex rel. Dereczynski v. Longo*, 368 F. Supp. 682, 689 (N.D. Ill. 1973) (discussing that if probationers would have a right to bail pending revocation hearings, so must parolees), *aff'd*, 506 F.2d 1403 (7th Cir. 1974). Defendants' automatic detention policy thus violates the Fifth Amendment because it treats similarly situated parties disparately without a rational basis to do so.

## II.    Irreparable Harm

Without relief, Mr. Hagans and class members are suffering and will continue to suffer irreparable harm. "[D]eprivations of physical liberty of the type suffered by Plaintiff[] are the sort of actual and imminent injuries that constitute irreparable harm." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) (collecting cases). "Courts have likewise recognized that the 'major hardship posed by needless prolonged detention' is a form of irreparable harm." *Id.* (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). Further, "where a plaintiff requests injunctive relief mandating that an agency comply with a process that, if completed, could secure the plaintiff's freedom or could alleviate harsh conditions of confinement, the harm from detention surely cannot be remediated after the fact." *Id.* Mr. Hagans has been incarcerated for months in violation of his statutory and Constitutional rights. This prolonged deprivation of physical liberty is a *per se* irreparable harm.

The Commission has 65 days from the time of arrest to hold a revocation hearing. *See* 28 C.F.R. § 2.215(f). But people are often detained for even longer periods of time. For those facing criminal charges, for example, the revocation hearing often trails the trial, which "invariably delays such a hearing by more than 65 days." *Davis v. United States Parole Comm'n*, No. 20-cv-2897, 2021 WL 05758820, at *5 (D.D.C. Dec. 3, 2021) (quoting Stephen Husk Decl.). Such individuals could remain detained at the D.C. Jail for months, or years, as they await trial—even where the judge overseeing the criminal trial has ordered their release pending trial.[8]

Detention at the Jail for even short periods is harmful. "Because a new period of incarceration, even if only 24 hours in length, may cost [someone on supervision] his employment, and further jeopardize his chances for rehabilitation, the detention of an alleged violator is a serious matter and must be dealt with in a manner which clearly recognizes the degree of loss to be suffered." S. Rep. No. 94-369, at 339 (1975). People who are incarcerated pretrial can experience, *inter alia*: worsening mental illness, since conditions in jail can put a person under extreme stress and restrict access to needed medications; a high likelihood of being assaulted, including sexual assault, especially in the first few days of incarceration; exposure to communicable diseases; inability to exercise; deprivation of sunlight and fresh air; and forcible separation from children and family.[9] By being incarcerated, people undergo numerous external consequences as well, including loss of income (people often lose their jobs while detained); loss of housing and missed payments on utilities and other bills (people cannot make rent and other payments when jailed);

---

[8] As of April 2022, men held pretrial with felony charges spent an average of 13 months (390 days) incarcerated, while women held pretrial with felony charges spent an average of over eight months (257 days) incarcerated. Emilia Calma & Yesim Sayin, *Processing through D.C.'s criminal justice system: Agencies, roles, and jurisdiction*, D.C. Policy Center (Mar. 2, 2023).

[9] *Incarceration's Front Door: The Misuse of Jails in America*, Vera Institute of Justice, at 12 (July 29, 2015).

and loss of physical or legal custody of their children (children of incarcerated parents regularly end up in the dependency system due to no caregiver being available outside of jail).[10]

Mr. Hagans' and class members' irreparable harm is heightened by the dangerous conditions in the D.C. Jail, where they are incarcerated. A report by the Office of the District of Columbia Auditor issued three weeks ago found that the D.C. Jail has a death rate more than *three times* the national average, including 1,595 maintenance reports that demonstrated an immediate risk to health and safety. Ex. C, D.C. Auditor Report at 17, 48. In the same vein, in 2023, a federal class action lawsuit was filed against D.C. for failing to provide constitutionally adequate medical care to people in the D.C. Jail. *See V.C. et al., v. District of Columbia*, No. 23-cv-01139 (D.D.C. 2023). That suit remains pending. And for people like Mr. Hagans who have been ordered released pending trial, their Commission-ordered detention undermines the trial court's decision that they should be able to fight their case outside of jail, subjecting them to higher rates of conviction and worse sentencing outcomes. Indeed, in the analogous pretrial incarceration context, detained individuals are more likely to be convicted, and sentenced to longer terms of incarceration, than comparable individuals who can prepare their defense out of custody.[11]

---

[10] Sam McCann, *How "Collateral Consequences" Keep People Trapped in the Legal System*, Vera Institute of Justice (Nov. 29, 2023).

[11] *See* Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, Laura & John Arnold Found., at 12–18 (2013); Megan T. Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 J. L. Econ. & Org. 511, 535-36 (2018); Will Dobbie et al., *The Effects of Pre-Trial Detention on Conviction, Future Crime and Employment: Evidence from Randomly Assigned Judges,* 108 Am. Econ. Review 201, 203 (2018) (finding pre-trial release decreases the probability of being found guilty by 14 percentage points).

Finally, incarceration makes communities less safe: just two or three days of pretrial detention increases the risk of arrest on new charges for even low-risk persons.[12]

Mr. Hagans has experienced these dangerous conditions for months despite not being adjudicated guilty of any offense, and despite three federal judges finding that he should be released from the Jail pending adjudication because he is not a danger to the community. For example, Mr. Hagans has spent days without running water. Ex. A, Hagans Decl. ¶ 17. Other days he has remained locked in a cell after toilet water has flooded it with urine and feces. *Id.* ¶¶ 18–19. Several official reports corroborate Mr. Hagans' personal experience. A report by the U.S. Marshals after an inspection of the D.C. Jail confirmed that residents live in "large amounts of standing sewage" and lack access to clean water.[13] Even more recently, the D.C. Auditor's report detailed numerous and egregious health and safety failures at the D.C. Jail, including "broken and malfunctioning . . . plumbing." Ex. C, D.C. Auditor Report at 1.

The nutrition—and lack thereof—at the D.C. Jail is likewise hazardous. As the D.C. Auditor explained, "[r]esidents and staff have reported food contaminated with rotten or inedible materials, including bugs, rodents, and screws, improperly heated meals, and potentially contaminated water." Ex. C, D.C. Auditor Report at 2. Mr. Hagans has also been served food on dirty trays that is prepared by individuals with open wounds. *Id.* ¶¶ 29–30.

---

[12] *See* Timothy R. Schnacke, *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform*, Nat'l Inst. of Corr., at 16–17 (2014).

[13] U.S. Dep't of Justice, United States Marshals Service, Memorandum to Quincy Booth re: D/DC USMS Prisoners Detained by District of Columbia Department of Corrections, https://www.washingtonpost.com/context/u-s-marshals-service-nov-1-memo-to-d-c-dept-of-corrections-re-d-c-jail-inspection/1ecd5c89-1655-4e86-9ccc-28f432af78c5/?itid=lk_interstitial_manual_10.

Furthermore, the D.C. Jail does not provide adequate medical care.  *See V.C. et al., v. District of Columbia*, No. 23-cv-01139 (D.D.C.) (lawsuit against D.C. Jail for failing to provide constitutionally adequate medical care).  When Mr. Hagans finally saw a nurse for his intestinal pain, the Jail delivered expired medication to the wrong cell.  Ex. A, Hagans Decl. ¶ 25.  The Jail also failed to treat Mr. Hagans' separate allergic reaction to an unknown substance.  *Id.* ¶¶ 26–27.  Indeed, numerous "residents have reported problems with accessing specific medical care, including consistently providing prescribed medication[.]"  Ex. C, D.C. Auditor's Report at 2.  These unsanitary and dangerous conditions at a facility with a notoriously high death rate endanger Mr. Hagans' and class members' lives on a daily basis.

Finally, the Commission's violations of Mr. Hagans' and class members' due process rights constitute a separate irreparable harm.  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  As explained *supra*, the Commission's conduct violates the due process right to an individualized determination of whether pre-revocation detention is appropriate, and the right to be treated the same as similarly situated individuals on probation and federal supervised release. These constitutional violations are also *per se* irreparable harms.

## III.    Balance of the Equities and Public Interest

The balance of the equities weighs heavily in Mr. Hagans' and other putative class members' favor.  In evaluating this factor, the Court must "balance the competing claims of injury, which involves considering the effect on each party of the granting or withholding of the requested relief."  *Shvartser v. Lekser*, 308 F. Supp. 3d 260, 267 (D.D.C. 2018).  Where, as here, "the Government is the opposing party," the determination of the third and fourth factors regarding

"harm to the opposing party" and "the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

An injunction would cause no identifiable "harm" to Defendants.  As an initial matter, Defendants have no legitimate interest in breaking the law.  "The Government cannot suffer harm from an injunction that merely ends an unlawful practice."  *R.I.L-R*, 80 F. Supp. 3d at 191 (internal quotation omitted).  Similarly, the public interest weighs heavily in Plaintiffs' favor.  The public certainly has an interest in having government agencies follow the laws and regulations that govern them.  *General Elec. Co. v. Seamans*, 340 F. Supp. 636, 641 (D.D.C. 1972) ("There is little doubt that the overriding public interest lies in having the governmental agencies follow their own regulations.").  That interest is only more pronounced where people's liberty and health are implicated, as they are here.  And the public benefits from prohibiting unnecessary pre-hearing incarceration in light of the evidence showing that incarceration for even a couple of days increases chances of committing a new offense while in the community.  In sum, the harm to Plaintiffs and the public if no injunctive relief is issued far outweighs any burden to Defendants.

## CONCLUSION

For the reasons explained above, Plaintiffs respectfully request that this Court provisionally certify the class and issue a preliminary injunction effectuating Mr. Hagans' and putative class members' release or, in the alternative, requiring that Defendants make individualized determinations at a hearing about whether pre-revocation detention is necessary and appropriate.

Dated: June 16, 2025
      Washington, D.C.

                    */s/ Hanna M. Perry*
                    Hanna Perry (D.C. Bar No. 90003756)
                    Zoé Friedland (D.C. Bar No. 1781910)
                    Public Defender Service for the District of Columbia
                    633 3rd St. N.W.
                    Washington, D.C. 20001

Tel. 202-824-2198
Fax 202-824-2093
hperry@pdsdc.org
zfriedland@pdsdc.org

Elizabeth Henthorne (D.C. Bar No. 1562688)
Maura E. Smyles (D.C. Bar No. 90006775)
Ruby Giaquinto (D.C. Bar No. 90011104)
Jenner & Block LLP
1099 New York Ave. N.W.
Suite 900
Washington, D.C. 20001
Tel. (202) 639-6000
Fax (202) 639-6066
BHenthorne@jenner.com
MSmyles@jenner.com
RGiaquinto@jenner.com

45