**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ANTOWAN HAGANS,

       Plaintiff-Petitioner,
       *Individually and on behalf of*
       *all other similarly situated*

       v.

UNITED STATES PAROLE
COMMISSION, et al.

       Defendants-Respondents.

Case No. 25-cv-1671

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................1

ARGUMENT ...................................................................................................................6

I.      Plaintiffs are entitled to release from detention as well as injunctive relief against
        Federal Defendants. ...........................................................................................6

        A.      Plaintiffs are entitled to release from their unlawful detention...............................6

        B.      Plaintiffs' claims for injunctive relief are not precluded by the habeas
                statute. ....................................................................................................7

II.     Plaintiffs are likely to succeed on the merits. ......................................................9

        A.      Defendants detain putative class members without statutory authority, in
                violation of the Non-Detention Act. ...........................................................9

        B.      Defendants' automatic detention policy tracks their incorrect belief that
                18 U.S.C. § 4214 does not apply. ...........................................................14

        C.      The automatic detention policy violates procedural and substantive Due
                Process. ...............................................................................................16

                i.      Procedural Due Process. ..........................................................16

                ii.     Substantive Due Process..........................................................18

        E.      The automatic detention policy violates Equal Protection. ..............................21

III.    The irreparable harm of detention is uncontested...............................................23

IV.     The balance of equities and public interest favor Plaintiffs...................................24

CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

CASES

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)..........................................................7

*Al-Tamimi v. Adelson*, 916 F.3d 1 (D.C. Cir. 2019) ................................................ 24-25

*Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110 (D.D.C. 2018) ........................................24

*In re Bonner*, 151 U.S. 242 (1894) ...............................................................................7

*Boumediene v. Bush*, 553 U.S. 723 (2008) ...................................................................7

*Bush v. Gore*, 531 U.S. 98 (2000)................................................................................21

*Carter v. United States Parole Commission*, No. 25-CV-207, 2025 WL 1734694
 (D. Conn. June 23, 2025).........................................................................................4

*Chatman-Bey v. Thornburgh*, 864 F.2d 804 (D.C. Cir. 1988)........................................8

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) ..............................22

*Crowley v. Local No. 82*, 679 F.2d 978 (1st Cir. 1982), *rev'd on other grounds*, 467
 U.S. 526 (1984)......................................................................................................25

*Davis v. United States Sentencing Committee*, 716 F.3d 660 (D.C. Cir. 2013).............8

*Department of State v. Muñoz*, 602 U.S. 899 (2024)...................................................19

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022)......................19

*Douglas v. Buder*, 412 U.S. 430 (1973)......................................................................20

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) ...........................................25

*Duckett v. Quick*, 282 F.3d 844 (D.C. Cir. 2002) ........................................................20

*Duncan v. Walker*, 533 U.S. 167 (2001)......................................................................11

*Esteras v. United States*, 145 S. Ct. 2031 (2025)............................................... 16, 19-20

*Faheem-El v. Klincar*, 841 F.2d 712 (7th Cir. 1988) (en banc)...........................17, 18, 21

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973)............................................................16, 18

*Goings v. Court Services & Offender Supervision Agency for District of Columbia*,
 786 F. Supp. 2d 48 (D.D.C. 2011) ..........................................................................20

*Hoesch v. Broward County*, No. 11-cv-61060, 2011 WL 2938465 (S.D. Fla. July 20, 2011) ............................................................................................................22

*Howe v. Smith*, 452 U.S. 473 (1981)......................................................................9, 11

*Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017)......................................16

*Johnson v. United States*, 529 U.S. 694 (2000) ........................................................20

*League of United Latin American Citizens v. Executive Office of the President*, No. 25-cv-0946, 2025 WL 1187730 (D.D.C. Apr. 24, 2025).........................................25

*Lopez-Valenzuela v. Arpaio*, 770 F.3d 772 (9th Cir. 2014)........................................18

*Mathews v. Eldridge*, 424 U.S. 319 (1976)................................................................18

*Mathis v. United States Parole Commission*, 749 F. Supp. 3d 8 (D.D.C. 2024) ...........4

*Mons v. McAleenan*, No. 19-cv-1593, 2019 WL 4225322 (D.D.C. Sept. 5, 2019).........24

*In re Moore*, No. 00-3019, 2000 WL 274220 (D.C. Cir. Mar. 8, 2000)........................13

*Morrissey v. Brewer*, 408 U.S. 471 (1972)......................................................16, 17, 18

*Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010) ..............................................2

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012).........13

*Nelson v. City of Irvine*, 143 F.3d 1196 (9th Cir. 1998) ............................................22

*Noble v. United States Parole Commission*, 194 F.3d 152 (D.C. Cir. 1999)................22

*Orozco v. Garland*, 60 F.4th 684 (D.C. Cir. 2023)......................................................11

*Pimentel v. Dreyfus*, 670 F.3d 1096 (9th Cir. 2012).................................................22

*Romero-Romero v. Wofford*, No. 1:24-cv-00944, 2025 WL 391861 (E.D. Cal. Feb. 4, 2025) ..................................................................................................................19

*Skinner v. Switzer*, 562 U.S. 521 (2011) ....................................................................8

*Simms v. D.C.*, 872 F. Supp. 2d 90 (D.D.C. 2012) ....................................................25

*Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631 (U.S. June 27, 2025) ..............24

*Trump v. J.G.G.*, 145 S. Ct. 1003 (2025).....................................................................7

*United States ex rel. Hebel v. Luther*, 544 F. Supp. 179 (N.D. Ill. 1982)................5, 15

*United States v. Clark*, No. 17-CR-43, __ F. Supp. 3d __, 2025 WL 1135075 (W.D.N.Y. Apr. 17, 2025) ................................................................10, 13

*United States v. Haymond*, 588 U.S. 634 (2019) ..................................................10, 20

*United States v. Mares*, No. 23-CR-00252, 2023 WL 7921970 (D.D.C. Nov. 16, 2023) ..................................................................................................................19

*United States v. McLean*, 749 F. Supp. 3d 167 (D.D.C. 2024)....................................19

*United States v. Mercado*, No. 3:13-cr-181, __ F. Supp. 3d __, 2025 WL 297429 (D. Conn. Jan. 24, 2025) ..........................................................................10

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................17, 18, 19

*Widakuswara v. Lake*, No. 1:25-cv-1015, __ F. Supp. 3d __, 2025 WL 1166400 (D.D.C. Apr. 22, 2025), *appeal docketed*, No. 25-5144 (D.C. Cir. Apr. 24, 2025) ..................................................................................................................25

*Wilkinson v. Dotson*, 544 U.S. 74 (2005) .........................................................8, 9

## Statutes

18 U.S.C. § 3602(a) ......................................................................................................12

18 U.S.C. § 3606 ..........................................................................................................12

18 U.S.C. § 4001(a) ........................................................................................................9

18 U.S.C. § 4211 ..........................................................................................................10

18 U.S.C. § 4213(a)(2) .................................................................................................10

18 U.S.C. § 4214(a)(1)(A) .....................................................................................14, 15

D.C. Code 24-403.01(b)(6) .........................................................................................23

D.C. Code § 24–403.01(b)(1) ................................................................................22, 23

D.C. Code § 24-133(c)(1) ............................................................................................12

D.C. Code § 24-133(c)(2) ..............................................................................................9

D.C. Code § 24-133(c)(2)(A) ................................................................................10, 14

D.C. Code § 24-403.01(a)(2) .......................................................................................23

**Legislative Materials**

S. Rep. No. 94-369 (1975), *as reprinted in* 1976 U.S.C.C.A.N. 335 ...........................................24

S. Rep. No. 98-225 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182 .........................................14

**Other Authorities**

28 C.F.R. § 2.200(b) .....................................................................................................................21

28 C.F.R. § 2.214(g) .....................................................................................................................14

Advisory Comm'n on Sentencing, *Report of the District of Columbia Advisory Commission on Sentencing* (2005).........................................................................................23

Andrea Fenster, *Technical Difficulties: D.C. Data Shows How Minor Supervision Violations Contribute to Excessive Jailing*, Prison Policy Initiative (Oct. 28, 2020), https://www.prisonpolicy.org/blog/2020/10/28/dc_technical_violations/#fnref:5...........................................................................................................3

## INTRODUCTION

When an individual is accused of violating a condition of supervised release, the United States Parole Commission ("the Commission") takes no account of their dangerousness or their flight risk before automatically subjecting them to detention pending a revocation hearing. Defendants[1] do not contest that since 2023, they have not released a single person pending a revocation hearing. They also do not meaningfully contest the existence of their automatic detention policy, other than pointing to five instances of release over a period of five years—in other words, errant deviations in which 0.3 percent of the relevant population was released. And Defendants' arguments that the policy is lawful are wrong. Congress did not provide the Commission with authority to detain individuals prior to revocation at all, let alone automatically. And even if the Commission did have detention authority, the applicable laws and the Constitution require that it justify detention determinations before detaining Plaintiffs for months on end. Yet, prior to separating Mr. Hagans and putative class members from their families, disrupting their reintegration into the community, and detaining them at a dangerous jail, Defendants make no individualized determinations as to the necessity of detention. This type of automatic detention is clearly unlawful, is causing significant harm, and merits preliminary relief.

## BACKGROUND

Defendants admit that, in the last five years, they have detained 99.7 percent of individuals on supervised release throughout the period between a finding of probable cause and a final

---

[1] There are two sets of Defendants in this matter: Federal Defendants—the United States Parole Commission, Patricia Cushwa, and Pamela Bondi—and the Warden of the D.C. Jail. For ease of reference, and because the Warden does not defend the legality of Plaintiffs' detention, Dkt. 15, any reference to "Defendants" throughout this memorandum refers to Federal Defendants.

1

revocation hearing (or "pending revocation hearings"). Opp. at 20.[2] Defendants also do not contest that they have detained 100 percent of the hundreds of individuals pending further revocation proceedings in the last two years. Defendants' own argument makes clear that they maintain an unlawful automatic detention policy—the existence of five instances, amongst thousands, represents an exception, not the rule.

The evidence presented from both sides makes clear the existence of Defendants' automatic jailing policy. Although they admit they have released putative class members in just 0.3 percent of cases in the past five years, Defendants take issue with the Declaration of Natalie Epps, which outlines that, aside from a few errant exceptions, in recent years all supervised releasees represented by the Public Defender Service have been detained pending revocation hearings. Epps Decl. ¶¶ 5–6, Dkt. 12-4. However, Ms. Epps's declaration only corroborates Defendants' own evidence—that aside from a few de minimis exceptions (5 cases out of 1,678) the Commission has detained every individual pending further revocation proceedings.[3] Desrosiers Decl. ¶¶ 11–12, Dkt. 14-2.

Attempting to paper over this startling statistic, the Commission's Acting Chief of Staff speculates that the reason the Commission detained 99.7 percent of individuals pending further

---

[2] Citations to "Opp. at __" refer to Federal Defendants' Opposition to Motion for Preliminary Injunction, Dkt. 14. Citations to "Mot. at __" refer to Plaintiffs' Memorandum of Law in Support of Their Motion for a Preliminary Injunction, Dkt. 12-1.

[3] As Defendants acknowledge, the Public Defender Service only has access to information regarding the clients it represents—the complete data regarding the Commission's treatment of D.C. code supervised releasees is in the custody of the Commission. Defendants criticize Ms. Epp's reliance on internal data as hearsay, yet also rely on a declaration from Mr. Desrosiers citing internal data. Desrosiers Decl. ¶¶ 3, 11–12. Furthermore, Defendants misstate the evidentiary rules at the preliminary injunction phase. Opp. at 23–24 (citing cases discussing the introduction of evidence at trial and during summary judgment). In fact, "courts routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) (collecting cases from six circuits).

revocation proceedings in the last five years (and 100 percent since 2023) "could be because" the Commission chooses "not to proceed with the revocation process at all" in cases that are "low-level" or in which "compelling circumstances" or "sympathetic facts" exist.[4]   Desrosiers Decl. ¶ 12; Opp. at 20–21.  This argument is both legally irrelevant and factually dubious.

Legally, this case is about whether the Commission has the authority to detain individuals pending a revocation hearing, and, if it does, whether its process for doing so complies with its constitutional and statutory obligations.  That the Commission sometimes decides *not* to pursue a revocation hearing because a case has "compelling circumstances" or because it believes a revocation hearing would be futile is of no moment.  Desrosiers Decl. ¶ 12.  Defendants are still required to decide whether those who *will* have a revocation hearing should be detained pending that hearing based on dangerousness and flight risk.  Defendants' self-proclaimed benevolence elsewhere in its processes does not excuse breaking the law with respect to the putative class.

Defendants' characterization is also factually inaccurate.  Thirty percent of people who are arrested while on supervision for D.C. Code offenses are arrested for technical violations and another twelve percent are arrested for "public order" offenses like loitering and disorderly conduct.[5]   And the Commission frequently proceeds to a revocation hearing for technical violations of supervision, even when additional "sympathetic" facts exist.  Take for instance a

---

[4] In a footnote in his declaration, the Commission's Acting Chief of Staff notes that people who are purportedly "released" after the Commission terminates the revocation process "includes individuals released to the Re-Entry and Sanctions Center (RSC) or other treatment facilities and reinstated to supervision."  Desrosiers Decl. ¶ 12 n.1.  In other words, while the revocation proceedings may technically be over, that is because the person has agreed to stay at the jail awaiting placement in a locked facility.

[5] Andrea Fenster, *Technical Difficulties: D.C. Data Shows How Minor Supervision Violations Contribute to Excessive Jailing*, Prison Policy Initiative (Oct. 28, 2020), https://www.prisonpolicy.org/blog/2020/10/28/dc_technical_violations/#fnref:5.

named plaintiff in *Mathis v. United States Parole Commission*, a case in which Judge McFadden granted a preliminary injunction because the Parole Commission failed to accommodate plaintiffs' disabilities. 749 F. Supp. 3d 8 (D.D.C. 2024). Kennedy Davis was arrested for failing to call his supervision officer after a community-based organization that assists people with disabilities "forgot to put minutes" on the phone it had provided him. *Id.* at 14. The Commission decided to pursue revocation and, pursuant to its automatic detention policy, Mr. Davis was detained pending his revocation hearing. As the Court explained: "[A]lthough Davis had reported for drug testing on all required occasions—and tested negative each time—he was arrested on August 3, 2023. The arrest caused him to miss a surgery for his burns on August 8. And on October 4, the Commission imposed a 12-month sentence for Davis's technical violation." *Id.* (internal citations omitted); *see also Carter v. United States Parole Commission*, No. 25-CV-207, 2025 WL 1734694, at *1 (D. Conn. June 23, 2025) (granting habeas petition for D.C. Code supervised releasee who the Commission sentenced to two years of incarceration for technical violations).

In short, it is simply untrue that the Commission does not pursue revocation in "low-level" cases or in cases with "sympathetic facts." Rather, the individuals for whom the Commission pursues revocation have diverse and varied facts, and, if the Commission has the authority to detain them pending revocation at all, it must make individualized determinations about whether such detention is appropriate under the relevant statutory factors.

Finally, even though the Commission claims it made an individualized determination to detain Mr. Hagans, its own hearing digest does not include any evidence or findings related to Mr. Hagans' flight risk or dangerousness, considerations prescribed in 18 U.S.C. § 4214(a)(1)(A) and 28 C.F.R. § 2.214. *See* Opp. at 9. That failure tracks the Commission's mistaken belief that 18 U.S.C. § 4214 does not govern its decision to detain an individual pending further revocation

4

proceedings. Opp. at 32. Indeed, both in its Opposition and in Mr. Hagans' probable cause digest, the Commission merely notes that Mr. Hagans was on supervision (true for everyone on supervised release), he had criminal charges pending (true for most on supervised release who have been arrested), and it was his first alleged violation (a fact that should weigh in Mr. Hagans' favor). Opp. at 9. These facts—which are the same or less serious than the majority of revocation cases— do absolutely nothing to explain why Mr. Hagans should be detained pending his revocation hearing. *See United States ex rel. Hebel v. Luther*, 544 F. Supp. 179, 181–82 (N.D. Ill. 1982) (considering family connections, housing, and indications of stability when applying Section 4214). Characterizing a conclusory summary of the procedural posture of the case as an "individualized explanation" does not make it so. Opp. at 9. This bare recitation does not amount to consideration of release, particularly where the probable cause digest noted that three judges ordered Mr. Hagans' release but reached a contrary conclusion without explanation.

Defendants' only evidence that the Commission is making individualized determinations comes from Mr. Desrosiers, who merely claims that the Commission makes a "case by case judgment" about whether to release an individual pending revocation. *See* Desrosiers Decl. ¶¶ 9– 10. But that claim is belied by the fact that the Commission has detained 100 percent of supervised releasees pending further revocation proceedings in about two years. It strains credulity that over the past five years individualized determinations would result in a 99.7 to 100 percent detention rate across 1,678 cases that include low-level technical violations and other indicia of non- dangerousness and lack of flight risk. Indeed, three federal judges concluded that Mr. Hagans should not be detained at the D.C. Jail pre-trial (for the same alleged conduct that underlies the revocation proceedings) based on these very factors. The uncontested evidence here—that no D.C. Code supervised releasees were released pending further revocation proceedings since 2023, that

in the last five years the Commission has detained 99.7 percent of these individuals, and that there is no evidence the Commission considered flight risk and dangerousness in Mr. Hagans' case—demonstrates that Defendants do not make individualized findings regarding flight risk and dangerousness before detaining people for months pending revocation hearings.

## ARGUMENT

I.    **Plaintiffs are entitled to release from detention as well as injunctive relief against Federal Defendants.**

Plaintiffs seek release from unlawful pre-revocation detention, which flows from their Non-Detention Act claim.  *See* Mot. at 44.  In the alternative, Plaintiffs seek an order directing their release from detention unless and until Defendants make the statutorily required individualized determinations at a hearing about whether pre-revocation detention is necessary and appropriate.  And finally, Plaintiffs seek injunctive relief directing Defendants to make the requisite individualized determinations, in order to remedy ongoing constitutional violations.  *Id.*  Each form of relief is available here.

### A.  **Plaintiffs are entitled to release from their unlawful detention.**

Plaintiffs' detention violates federal law several times over, and their requested relief is appropriately tailored to remedy such illegality.  Most fundamentally, Plaintiffs' detention is unlawful because it is not authorized by statute, thereby violating the Non-Detention Act's prohibition on detaining a United States citizen without statutory authorization.  *See* Mot. at 15–17; *see also infra* at 9–14.  Only release from detention could remedy this illegality.

Even if the Court determines that Congress has authorized the Commission to detain individuals prior to revocation, Plaintiffs' detention would remain unlawful absent individualized determinations mandated by statute.  *See* Mot. at 17–44; *see also infra* at 14–23.  This Court could remedy those aspects of the detention's illegality by directing Plaintiffs' release unless and until

Defendants render the requisite individualized determinations that pre-revocation detention is necessary and appropriate.  *See Aamer v. Obama*, 742 F.3d 1023, 1035 (D.C. Cir. 2014) ("[A] [habeas] court may simply order the prisoner released unless the unlawful conditions are rectified."); *In re Bonner*, 151 U.S. 242, 262 (1894) (directing issuance of writ of habeas corpus in favor of petitioner illegally detained in state penitentiary, but "without prejudice to the right of the United States to take any lawful measures to have the petitioner sentenced" to proper place of detention).

This relief is available regardless of whether Federal Defendants are Plaintiffs' custodians. Plaintiffs have also sought relief against the Warden, who is unquestionably Plaintiffs' custodian; it is thus undisputed that their habeas petition is properly before this Court.[6]  And because habeas is not a "formalistic remedy," *Boumediene v. Bush*, 553 U.S. 723, 780 (2008), courts in this Circuit are not to engage in "formalistic, technical line-drawing" when considering claims for relief through habeas petitions, *Aamer*, 742 F.3d at 1035.  Indeed, "the habeas petitioner's essential claim is that his custody in some way violates the law, and he may employ the writ to remedy such illegality." *Id.* at 1036; *see also Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025) ("[I]mmediate physical release [is not] the only remedy under the federal writ of habeas corpus." (quoting *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (alteration in original))).

**B.  Plaintiffs' claims for injunctive relief are not precluded by the habeas statute.**

In addition to habeas claims, Plaintiffs properly raise constitutional challenges to the Commission's automatic detention policy and seek relief from ongoing constitutional violations.

---

[6] The Warden has opted not to defend the legality of Plaintiffs' detention. Dkt. 15. For this reason alone, Plaintiffs are likely to succeed on their habeas claims.  But even if this Court were to consider Federal Defendants' substantive arguments as if they were raised by the Warden, those arguments fail, as addressed in subsequent sections.

*See* Compl. ¶¶ 98-104, 111–116.  Under binding precedent, Plaintiffs' claims for injunctive relief are not precluded by the habeas statute because Plaintiffs are not seeking immediate or early release from detention via those claims.  Federal Defendants are thus proper parties in this action, and this Court may grant non-habeas relief.[7]

Defendants do not dispute that this Court may enjoin ongoing violations of federal law by federal officials.  They contend only that the habeas statute displaces the injunctive relief Plaintiffs seek—namely, an order directing Defendants to render individualized determinations at a hearing about whether pre-revocation detention is necessary and appropriate.  *See* Opp. at 13-14.  That is wrong.

As the D.C. Circuit clarified in 2013, only where success on the merits of a claim would "*necessarily* imply the invalidity of confinement or shorten its duration" does the habeas-channeling rule kick in.  *Davis v. U.S. Sent'g Comm'n*, 716 F.3d 660, 666 (D.C. Cir. 2013) (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005)) (emphasis added).[8]  By contrast, where success on the merits "would have a merely probabilistic impact on the duration of custody,"—say, by "allowing [a prisoner] to seek a discretionary reduction of his sentence" that may not ultimately be granted—the claim may be brought outside the habeas vehicle.  *Id.* at 662, 664.

---

[7] To the extent this Court remedies the constitutional violations by ordering Plaintiffs' release, or release unless and until individualized determinations that detention is necessary and appropriate are made, the Court need not reach the standalone constitutional claims in resolving the Motion for Preliminary Injunction.

[8] In *Davis*, the D.C. Circuit abandoned the broader habeas-channeling rule that Defendants cite for federal prisoners articulated in *Chatman-Bey v. Thornburgh*, 864 F.2d 804 (D.C. Cir. 1988), including because that broader rule was undermined by intervening Supreme Court precedent.  716 F.3d at 664–65; *see also Wilkinson v. Dotson*, 544 U.S. 74 (2005); *Skinner v. Switzer*, 562 U.S. 521 (2011).

Here, an order directing Defendants to make individualized determinations would not necessarily result in Plaintiffs' release from detention, immediately or otherwise. Rather, it would provide an opportunity to seek release from detention on the basis of one's individual circumstances. The problem with Defendants' argument, then, "lies in its jump from a true premise (that in all likelihood the [Plaintiffs] hope these actions will help bring about earlier release) to a faulty conclusion (that habeas is their sole avenue for relief)." *Wilkinson*, 544 U.S. at 78.

## II.    Plaintiffs are likely to succeed on the merits.

### A. Defendants detain putative class members without statutory authority, in violation of the Non-Detention Act.

Defendants do not contest that, pursuant to the Non-Detention Act, they must have a "congressional grant of authority to detain" individuals prior to revoking their supervised release. *Howe v. Smith*, 452 U.S. 473, 479 n.3 (1981); *see* 18 U.S.C. § 4001(a). Rather, the Commission argues that two statutes—18 U.S.C. § 4213(a)(2) and 18 U.S.C. § 3606—provide that authority. They do not.

As an initial matter, the Commission's authority over individuals on supervised release for D.C. Code offenses comes from D.C. Code § 24-133(c)(2), which states that "any offender who is released from imprisonment for any term of supervised release imposed by the Superior Court of the District of Columbia . . . shall be subject to the authority of the United States Parole Commission until completion of the term of supervised release." The limits of this authority are not contained within the D.C. Code. Instead, the D.C. Code cross references the federal supervised release statute: The Commission "shall have and exercise the *same authority* as is vested in the United States district courts by paragraphs (d) through (i) of § 3583 of title 18, United States Code." D.C. Code § 24-133(c)(2) (emphasis added). Paragraphs (d) through (i) of Section 3583 describe courts' authority with respect to supervised release: They may set and modify conditions

of supervised release, terminate or extend supervised release, and revoke supervised release with a requirement to serve a term in prison.  The Commission does not dispute that these paragraphs do not authorize detaining individuals *prior* to revoking their supervised release.  In other words, Congress specified the sole source of the Commission's authority, and that source does not authorize pre-revocation detention.  The inquiry should end there.[9]

The Commission's reliance on a provision of the now-repealed law governing *parole* revocation as the source of its purported detention authority is misplaced.  The Commission bases this argument on the fact that the D.C. Code states that the "*procedures* followed by the Commission *in exercising such authority* [over individuals on supervised release] shall be those set forth in chapter 311 of title 18, United States Code," D.C. Code § 24-133(c)(2)(A), which includes that now-repealed law, 18 U.S.C. § 4213(a)(2).[10]  There are at least two problems with the Commission's reliance.  First, by its plain text, Congress's cross reference to chapter 311 of title 18 is limited to the procedures the Commission must follow when exercising its authority

---

[9] Courts disagree about whether District Courts have the authority to detain individuals pending revocation.  *Compare United States v. Mercado*, No. 3:13-cr-181, __ F. Supp. 3d __, 2025 WL 297429, at *1 (D. Conn. Jan. 24, 2025) with *United States v. Clark*, No. 17-cr-43, __ F. Supp. 3d __, 2025 WL 1135075, at *3 (W.D.N.Y. Apr. 17, 2025).  But they agree that any authority to do so comes not from 18 U.S.C. § 3583, but from other sources of law—Federal Rule of Criminal Procedure 32.1 and 18 U.S.C. § 3143(a)(1) (the Bail Reform Act)—that Defendants do not and cannot argue apply to the Commission.

[10] Defendants specifically reference language from 18 U.S.C. § 4213(a)(2) that allows the Commission to "retake a parolee" if the "parolee is alleged to have violated his parole."  *See* Opp. at 14; 18 U.S.C. § 4213(a)(2).  This language is inapplicable to individuals on supervised release, who cannot be "retaken" and returned to custody because they are not serving part of their prison term.  In contrast to parole, "supervised release wasn't introduced to replace a portion of the defendant's prison term, only to encourage rehabilitation after the completion of his prison term." *United States v. Haymond*, 588 U.S. 634, 652 (2019) (plurality opinion).  Indeed, even the Commission understands that Congress did not intend for the wholesale incorporation of each provision of chapter 311 into the Commission's administration of supervised release.  For example, the Commission does not apply the provision on early termination of parole after five years of parole supervision, 18 U.S.C. § 4211, to supervised release.

exclusively granted in 18 U.S.C. § 3583, *i.e.*, its authority over supervised release.  But only the law that governs the Parole Commission's "authority" can provide the "congressional [] authority" required by the Non-Detention Act.  *Howe*, 452 U.S. at 479 n.3.  And, as explained *supra*, paragraphs (d) through (i) of 18 U.S.C. § 3583 do not provide that authority.

In *Orozco v. Garland*, the D.C. Circuit considered a similar question about the breadth of a limited cross reference in the Rehabilitation Act.  The question there was "whether Section 794d(f)(3)'s incorporation of the 'remedies, procedures, and rights' created in Section 794a(a)(2) also brings with it the latter Section's separate limitations on who can sue."  *Orozco v. Garland*, 60 F.4th 684, 688 (D.C. Cir. 2023).  The court held it did not: "We take Congress at its word that, when it incorporated the 'remedies, procedures, and rights' set forth in another part of the Rehabilitation Act, it did that and no more."  *Id.* at 689.  So too here.  When Congress incorporated only the "procedures" of chapter 311 of title 18, it did that and no more.  *Id.*  It is the authority granted by Section 3583 that "controls."  *Id.*

Second, implying authority to detain from a statute cross-referenced for procedural purposes would nullify the distinction Congress made between the Commission's "authority" and its "procedures" with respect to D.C. Code supervised releasees.  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (explaining that courts have a "duty to give effect, where possible, to every word of a statute") (quotation marks omitted).  Indeed, Congress drafted D.C. Code § 24-133(c)(2) against the backdrop of the Non-Detention Act, which the Supreme Court had already held required a "congressional grant of *authority*" to detain.  *Howe*, 452 U.S. at 479 n.3 (emphasis added).  Because Congress defined the Commission's "authority" by cross-referencing a specific statute, the Commission cannot supplement that authority from a statute Congress cross-referenced for exclusively procedural purposes.

The Commission's next argument—that 18 U.S.C. § 3606 provides its detention authority—is wrong twice over because Section 3606 neither applies to the Parole Commission nor authorizes pre-revocation detention.

Most fundamentally, Section 3606 does not add to the Parole Commission's authority over D.C. Code offenders on supervised release. Rather, the statute applies to courts and probation officers, who are appointed by district courts, *see* 18 U.S.C. § 3602(a), and do not supervise D.C. Code supervised releasees, D.C. Code § 24-133(c)(1). In fact, Section 3606 is part of a broader law about federal offenders and federal supervision, which is administered by District Courts and the U.S. Probation Office, and has absolutely nothing to do with the Parole Commission. The Commission argues that the statute is not limited to "specific courts," Opp. at 19, but the statute, by its own terms, applies only to courts, and the Commission is not a court, it is a federal agency. The Commission also argues that the law applies to people who are not currently supervised by any court, Opp. at 17, even though it clearly states that in those cases, "*the court last having supervision* of the probationer or releasee, may issue a warrant for the arrest of a probationer or releasee for violation of a condition of release," 18 U.S.C. § 3606 (emphasis added). Other than this subversion of the plain text, the Commission does not even attempt to explain how Section 3606 relates to its administration of supervised release for D.C. Code offenses which, as explained *supra*, comes from D.C. Code § 24-133(c)(2) and cross-references two federal statutes, neither of which are 18 U.S.C. § 3606.

What is more, Section 3606 authorizes only *arrest*, not pre-revocation detention. As one court explained, "[o]n its face, the text of section 3606 does not authorize anything beyond the arrest and detention pending initial appearance of someone who is alleged to have violated a condition of supervised release. So the authority to detain someone accused of a supervised release

violation—if it exists—must come from somewhere else." *United States v. Clark*, No. 17-CR-43, 2025 WL 1135075, at *3 (W.D.N.Y. Apr. 17, 2025). Thus, even if Section 3606 did apply to the Parole Commission, it could not be the source of its pre-revocation detention authority.

In the same vein, the unpublished D.C. Circuit case on which the Commission relies is about the *District Court's* authority to detain a defendant pending a revocation hearing. *In re Moore*, No. 00-3019, 2000 WL 274220, at *1 (D.C. Cir. Mar. 8, 2000). Notably, the Court (in its one-paragraph analysis) relied on a joint citation to both 18 U.S.C. § 3606 (which authorizes arrest) and Federal Rule of Criminal Procedure 32.1 (which governs pre-revocation detention) to support its conclusion that the *District Court* had the authority to detain someone pending revocation. *Id.* But once again, neither of these provisions grant any authority to the *Parole Commission*, whose authority over D.C. Code supervised releasees is governed by the D.C. Code and is specifically limited to "paragraphs (d) through (i)" of Section 3583.

Finally, the Commission protests the policy implications of Congress's failure to authorize pre-revocation detention because, they say, that would render them "powerless" to detain individuals who are dangerous or a flight risk. Opp. at 14. But as an initial matter, they do not know who is dangerous or a flight risk, because they do not bother making such determinations. Such fear-mongering is also unwarranted because anyone accused of violating their supervised release by committing a new criminal offense can be detained by a court pre-trial even if the Commission cannot detain them pre-revocation. And in any case, the policy implications of acknowledging that Congress did not authorize the Parole Commission to detain individuals before revoking their supervised release are not relevant to the Court's legal analysis. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (explaining that courts "possess neither the expertise nor the prerogative to make policy judgments" because "[t]hose decisions are entrusted

to our Nation's elected leaders, who can be thrown out of office if the people disagree with them").

Notably, Congress initially did not even provide for revocation for a violation of a condition of

supervised release "because it does not believe that a minor violation of a condition of supervised

release should result in resentencing of the defendant." S. Rep. No. 98-225, at 125 (1983), *as*

*reprinted in* 1984 U.S.C.C.A.N. 3182, 3308.

### B.  Defendants' automatic detention policy tracks their incorrect belief that 18 U.S.C. § 4214 does not apply.

As explained *supra*, the Commission lacks the authority to detain individuals without first

revoking their supervised release. However, if the Court disagrees and identifies some source of

Congressional authorization for pre-revocation detention, the Commission in that situation "shall"

follow the procedures in chapter 311 of title 18 to administer that detention. D.C. Code § 24-

133(c)(2)(A). Chapter 311 of title 18 includes 18 U.S.C. § 4214(a)(1)(A), which states that:

> [A]fter a finding of probable cause the Commission may restore any parolee to
> parole supervision if: (i) continuation of revocation proceedings is not warranted;
> *or* (ii) *incarceration of the parolee pending further revocation proceedings is not*
> *warranted* by the alleged frequency or seriousness of such violation or violations;
> (iii) the parolee is not likely to fail to appear for further proceedings; and (iv) the
> parolee does not constitute a danger to himself or others. (emphasis added).

To put it plainly, after finding probable cause for an alleged violation, the Commission can

restore a supervised releasee to supervision, which necessarily involves release into the

community, in two scenarios: (1) continuation of revocation proceedings is not warranted at all;

"or" (2) such proceedings *are* warranted, but incarceration of the supervised releasee pending those

proceedings is not warranted by the statutory factors. The regulations that guide the Parole

Commission's authority over D.C. Code supervised releasees, 28 C.F.R. § 2.214(g), mirror this

language, providing that "[n]otwithstanding a finding of probable cause, the Commission may

order the releasee's reinstatement to supervision or release *pending further proceedings*" where

the individual is neither a danger nor flight risk. *Id.* (emphasis added). And if there was any

14

remaining ambiguity, courts have been clear that the Section 4214 factors guide the Commission's determination to release, or hold, individuals pending revocation proceedings. *See Hebel*, 544 F. Supp. at 181–82 (overturning the Commission's denial of release pending parole revocation proceedings upon considering the factors of Section 4214).

Yet, the Commission inexplicably believes that this "statute has nothing to do with the decision to detain or release an offender pending a revocation hearing," Opp. at 32, despite its plain text stating that it applies when "incarceration of the parolee *pending further revocation proceedings* is not warranted," 18 U.S.C. § 4214(a)(1)(A) (emphasis added). If the Commission released individuals pending further revocation proceedings (which it would be doing absent an automatic detention policy), those individuals would necessarily be restored to supervision while awaiting their revocation hearings.

Defendants' reading of the statute borders on nonsensical, and perhaps betrays why the automatic detention policy exists—they believe the "statute does not require the Commission to exercise discretion in making the decision to release or detain an offender pending a revocation decision." Opp. at 32. It is no wonder they are automatically detaining putative class members. The Commission's belief that the law does not apply to them is clear evidence that it is, by its own admission, not following the law and not making individualized determinations that consider flight risk and dangerousness.

Stranger still, the Commission's claim that the law is inapplicable is belied by its insistence, earlier in its opposition, that it considered the Section 4214 factors when making an individualized determination in Mr. Hagans' case (despite not providing any evidence that it considered dangerousness or flight risk). Opp. at 19. In either event, Defendants admit to not following the law. Either they believe that the law does not apply to them and therefore admit they are not

following the process prescribed by Section 4214, or they acknowledge that the law *does* apply to them even though they do not, in fact, contemplate flight risk or dangerousness before automatically detaining individuals pending revocation.

### C. The automatic detention policy violates procedural and substantive Due Process.

For distinct but related reasons, the Commission's automatic detention policy deprives putative class members of both their procedural and substantive due process rights.

### i.    Procedural Due Process

The Commission's practice of automatically jailing people accused of violating a condition of release without any consideration of the necessity of such detention violates procedural due process. Defendants' argument to the contrary relies exclusively on a single line of dicta from *Morrissey v. Brewer*, 408 U.S. 471 (1972). Opp. at 26–27. However, *Morrissey*, which announced due process rights for people on parole, and which was later applied to probation, *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973), did not set the constitutionally required procedures for those on supervised release. Unlike those on parole and probation, people on supervised release have already completed their prison term, Mot. at 19–20, and thus have a heightened interest in remaining in the community, warranting greater procedural protections. *Hurd v. District of Columbia*, which Defendants cite, only supports this proposition. 864 F.3d 671, 683 (D.C. Cir. 2017). There, the Court rejected the district court's conclusion that someone on supervised release does not have "a protected liberty interest in . . . continued freedom" where they were mistakenly released from prison. *Id.* at 682 (internal quotation marks omitted). As the Court explained, "the character of supervised release as a follow-on to a sentence of imprisonment . . . *strengthens* his liberty interest." *Id.* at 683 (emphasis added); *see also Esteras v. United States*, 145 S. Ct. 2031, 2041 (2025) (noting that, because supervised release "is not a punishment in lieu of incarceration,"

and "fulfills rehabilitative ends," courts assessing a violation of supervised release "may not consider the backward-looking purpose of retribution" (internal quotation marks omitted)).

Moreover, this issue of automatic detention was not before the Court in *Morrissey*. In fact, that Court did not assess a system where people were automatically jailed pending a hearing on the merits, because the parole system at issue there did not even provide a hearing on the merits to begin with. Instead, confronted with a system lacking any procedural protections at all, the *Morrissey* Court established the "minimum requirements of due process [rights]" available to people facing revocation of parole. 408 U.S. at 488–89.

Among these requirements was that a finding of probable cause at a preliminary hearing is a prerequisite for detention before a revocation hearing. *Id.* at 487. But that is separate from the question at issue here. There is a "substantial difference" between the determination that there is probable cause to believe a violation occurred and "a determination that an individual should be detained pending his or her final revocation hearing." *Faheem-El v. Klincar*, 841 F.2d 712, 725 (7th Cir. 1988) (en banc). Just as the requirement of a probable-cause finding following a warrantless arrest is legally distinct from the determination of whether an individual may be jailed pending trial, so too is the Commission's probable cause decision distinct from its decision to detain someone pending a revocation hearing. *Cf. United States v. Salerno*, 481 U.S. 739, 750 (1987) (upholding federal statutory scheme for pretrial detention because it required a determination that governmental interests were served by detention *separate from* the finding of probable cause that a crime was committed).

The en banc Seventh Circuit in *Faheem-El v. Klincar* assessed a similar automatic pre-revocation detention practice for people on parole and agreed that *Morrissey* did not resolve the question: Because this "specific issue"—"what process, if any, is required to protect a parolee's

17

liberty interest during the time between the preliminary revocation hearing and the final revocation hearing"—"was not before the Court in *Morrissey*, we do not believe that [the Court's decision] is a dispositive statement of what process is required in this case." 841 F.2d at 724–25. In other words, *Morrissey* set the floor by announcing a "few basic requirements" of due process, *Morrissey*, 408 U.S. at 490, rather than the ceiling. Indeed, just one year after *Morrissey*, the Supreme Court in *Gagnon* added a new due process requirement to revocation proceedings: representation by counsel. 411 U.S. at 786.

After *Morrissey*, the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), provided the framework to determine what additional process may be due. *See Faheem-El*, 841 F.2d at 725. As explained more fully in Plaintiffs' Motion for a Preliminary Injunction, and Defendants say nothing to the contrary, the *Mathews* factors all weigh in Plaintiffs' favor: Plaintiffs' interests in remaining in the community are significant and even greater than those of the people on parole assessed in *Morrissey*, *see* Mot. at 18–20; the risk of erroneous deprivation—jailing people unnecessarily due to a lack of flight risk or dangerousness—is significant in Defendants' current system that lacks any means to obtain release, *id.* at 22; and Defendants do not contend that justifying their detention decisions would result in any undue burden, *see id.* at 22–23. Thus, Mr. Hagans and putative class members have a clear right to the basic procedural safeguard of an opportunity to seek release and avoid unnecessary months-long detention.

## ii.    Substantive Due Process

Defendants do not argue that a policy of automatic pre-revocation detention survives heightened scrutiny, *United States v. Salerno*, 481 U.S. 739 (1987), or that one's status as a supervisee accused of a violation is an adequate proxy for dangerousness or flight risk, *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 786 (9th Cir. 2014). *See* Opp. at 27–32. Instead, they contend

there is no fundamental constitutional right at issue and argue that Plaintiffs' claim is foreclosed by binding D.C. Circuit precedent. *See id.* The Court should reject both premises.

Plaintiffs' substantive due process claim relies on a recognized right to freedom from detention prior to adjudication of the merits, which may be qualified by certain governmental interests, including public safety and flight prevention. *See Salerno*, 481 U.S. at 748–49.[11] Contra the Defendants' suggestion, the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 237 (2022), has no bearing on the existence of such a right. *See e.g.*, *United States v. Mares*, No. 23-CR-00252, 2023 WL 7921970, at *2 (D.D.C. Nov. 16, 2023) (Reyes, J.) (citing *Salerno* for the proposition that pretrial detention is the exception not the rule); *United States v. McLean*, 749 F. Supp. 3d 167, 173 (D.D.C. 2024) (applying *Salerno*); *Romero-Romero v. Wofford*, No. 1:24-cv-00944, 2025 WL 391861, at *8 (E.D. Cal. Feb. 4, 2025) (collecting cases applying *Salerno* since *Dobbs*). Plaintiffs ask only that this recognized right be vindicated for people convicted of D.C. Code offenses who are alleged to have violated supervised release conditions, but whose guilt of such violations has not been proven.

Defendants also contest the applicability of any right to freedom from detention to Mr. Hagans and putative class members, repeatedly emphasizing that Plaintiffs were convicted of an offense that resulted in their supervised release. *See* Opp. at 30. Those prior convictions, however, do not authorize automatic re-incarceration any time a violation of those conditions is alleged (but not proven) and regardless of public safety or flight risk considerations. *Cf. Esteras*, 145 S. Ct. at

---

[11] That the right as articulated in *Salerno* bends to these government interests—which, in practice, requires the government to make individualized safety and flight determinations—does not make Plaintiffs' claim a hybrid procedural and substantive due process claim as Defendants say. Opp. at 31. Plaintiffs do not request only procedural due process protections as in *Department of State v. Muñoz*, 602 U.S. 899, 911 (2024); rather, they request that if their fundamental right is restrained, the government first make a determination that its interests justify that deprivation.

2041–42 (holding courts may only revoke supervised release and order reincarceration for limited purposes). Plaintiffs do not contest that, as supervisees, their liberty interests are in some ways diminished relative to individuals not on supervised release. But the unique restrictions on their liberty are the conditions of supervised release imposed at sentencing—*e.g.*, mandated drug-testing or home-visits with supervision officers—and the possibility of "postrevocation penalties" when they are found to have violated those conditions, not before. *Johnson v. United States*, 529 U.S. 694, 701 (2000). These conditions do not reduce Plaintiffs' liberty interest in remaining in the community, but rather are intended to "encourage rehabilitation after the completion of his prison term." *United States v. Haymond*, 588 U.S. 634, 652 (2019). And even these "[c]onditions of supervised release" must be "narrowly tailored to serve a compelling state interest" when they "implicate fundamental liberty interests." *Goings v. Court Servs. & Offender Supervision Agency for D.C.*, 786 F. Supp. 2d 48, 68 (D.D.C. 2011) (internal quotation marks omitted).

For similar reasons, Defendants' assertion that binding D.C. Circuit precedent forecloses Plaintiffs' substantive due process claim is incorrect. *See* Opp. at 29. The case they point to, *Duckett v. Quick*, held that a decision to revoke parole does not violate substantive due process principles unless it was "either totally lacking in evidentiary support or . . . so irrational as to be fundamentally unfair." 282 F.3d 844, 847 (D.C. Cir. 2002). But the *Duckett* standard is rooted in judicial deference to the individualized decision rendered by a distinct adjudicator, be it a decision by the Bureau of Prisons to revoke an individual's parole, *id.*, or a decision by a state court judge to revoke an individual's probation, *see Douglas v. Buder*, 412 U.S. 430 (1973). Here, by contrast, Plaintiffs do not ask this Court to second-guess individualized decisions by the Parole Commission; in fact, no such individualized decisions regarding pre-revocation detention have been rendered, which is the very crux of Plaintiffs' constitutional claims.

Further, even if the *Duckett* standard applied, Defendants err in arguing that automatic pre-revocation detention based solely on a finding of probable cause "passes muster" under that standard. Opp. at 29. As the Seventh Circuit has explained, there is a "substantial difference between the determination that there is probable cause to believe a condition of parole has been violated (the issue at the preliminary revocation hearing) and a determination that an individual should be detained pending his or her final revocation hearing." *Faheem-El*, 841 F.2d at 725. The relevant evidentiary support for the latter must be evidence of dangerousness or flight risk, which is utterly lacking where, as here, Plaintiffs are detained without consideration of those interests.

### D. The automatic detention policy violates Equal Protection.

Defendants do not contest that D.C. code supervisees are treated differently than their similarly situated peers in the federal system—they just say it does not matter.

First, individuals on supervised release for D.C. Code offenses are similarly situated to those on supervised release for federal offenses because of the unique grant of authority to the Commission by Congress. Specifically, "[t]he U.S. Parole Commission shall have and exercise the *same authority* with respect to a term of supervised release as is vested in the United States district courts by 18 U.S.C. 3583(d) through (i)." 28 C.F.R. § 2.200(b) (emphasis added); D.C. Code § 24-133(c)(2) (emphasis added). This is not a case of two governmental entities exercising independent or otherwise distinct authority, this is a case of two government entities explicitly exercising the *very same authority*, each through a congressional delegation. *Cf. Bush v. Gore*, 531 U.S. 98, 104–06 (2000) (finding a central allocation of the same authority across distinct government entities could result in an equal protection violation). In that circumstance, equal protection concerns require that the single authority be exercised consistently, or else with a rational basis for treating some differently than others.

21

Defendants' cited authorities are not to the contrary. Some deal with different agencies administering the same substantive criminal statute in different ways, but without any shared authority between the agencies. *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154–55 (D.C. Cir. 1999); *Nelson v. City of Irvine*, 143 F.3d 1196, 1205 (9th Cir. 1998). Others deal with challenges to substantive differences between state and federal regulations, or state and local laws on the same topic. *Pimentel v. Dreyfus*, 670 F.3d 1096 (9th Cir. 2012); *Hoesch v. Broward Cnty.*, No. 11-cv-61060, 2011 WL 2938465 (S.D. Fla. July 20, 2011). But none involve differential application of the "same authority" like the one at issue here.

The Commission's policy also falls far short of satisfying rational basis review. In fact, Defendants' proposed rationales for differential treatment highlight how arbitrary the Commission's policy is. To start, Defendants suppose that "more rigorous[]" supervision is a rational course for those convicted of more serious offenses. Opp. at 37–38. But unlike in the federal system, supervised release follows *every* prison term for felony offenses in D.C., not just the most serious ones. D.C. Code § 24–403.01(b)(1). In any event, Defendants "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985). Plaintiffs were living in the community at the time of their alleged supervision violations—many of which are technical violations, *see supra* at 3—and the fact that they had previously served a prison term cannot justify a blanket detention policy without any individualized determination.

Defendants' claim that the D.C. Code ostensibly allows supervised release to be used as a punitive tool, Opp. at 40–41, rests on a misunderstanding of the law.[12] The D.C. Code empowers

---

[12] To similar effect is Defendants' unsupported argument that because longer sentences *may* be given in federal court, stricter supervised release for D.C. supervisees creates a rough balance in terms of the punitive force of a sentence. Opp. at 39–40. But the Commission's objection to the

D.C. courts to impose a "*sentence*" for a felony conviction that "[p]rovides for just punishment." D.C. Code § 24-403.01(a)(2) (emphasis added). Independent of that sentence, the court must separately provide for a term of supervised release, which the statute does not refer to as a means of punishment. *Id.* § 24-403.01(b)(1). And pursuant to D.C. Code 24-403.01(b)(6), any revocation decisions must be made pursuant to the federal law, which Defendants concede does not permit consideration of retributive factors. Opp. at 14; *see also* Advisory Comm'n on Sentencing, *Report of the District of Columbia Advisory Commission on Sentencing* 16, 19 (2005) (Congress "borrowed and incorporated" the federal system of supervised release into the D.C. Code, including its non-punitive nature).

Finally, Defendants propose that simply because Plaintiffs are supervised in D.C., that provides a special basis for their inferior treatment. Opp. at 41–42. Setting aside the suggestion that D.C. supervisees alone are subject to a uniform detention policy purely because of the District's "unique constitutional status," *id.* at 41, Defendants offer no basis for thinking that Congress has in fact authorized (let alone required) such differential treatment. As discussed, the statutory scheme in place here decisively *rejects* the Commission's automatic detention policy. It therefore cannot serve as a basis for Plaintiffs' differential treatment.

## III. The irreparable harm of detention is uncontested.

Defendants do not contest, because they cannot, the horrific conditions at the D.C. Jail and the harm that Mr. Hagans suffers as a result of his detention. In fact, Defendants' two sentence argument does not even address Mr. Hagans' declaration, in which he documents living in standing sewage and failing to receive medical care (Ex. A, Hagans Decl., Dkt. 12-3), the D.C. Auditor's

---

sentencing system in D.C. does not give it carte blanche to prescribe its own punitive values onto people sentenced in D.C. Superior Court in order to correct a purported "imbalance."

report, which urgently calls for the Jail's "immediate replacement" due to the risks of being held

there (Ex. C, D.C. Auditor Report, Dkt. 12-5), or Congress's recognition that "only 24 hours" of

incarceration can lead to devastating costs for incarcerated people (S. Rep. No. 94-369, at 18

(1975), *as reprinted in* 1976 U.S.C.C.A.N. 335, 339).  Every day that Mr. Hagans and putative

class members are held at the Jail exposes them to unsanitary conditions, violence, and a lack of

medical treatment, all of which can, and sometimes do, result in death.

 Rather than address these facts, Defendants offer a string cite to cases not related to

incarceration and loss of liberty.    These cases are not relevant.    The injury in this case is a

"purportedly inappropriate detention" causing "mental distress" and "physical distress," which is

exactly "the sort of actual and imminent injur[y] that constitute[s] irreparable harm."  *Aracely, R.

v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018).  "[D]etention irreparably harms individuals

in myriad ways" and those injuries are "beyond remediation."  *Mons v. McAleenan*, No. 19-cv-

1593, 2019 WL 4225322, at *11 (D.D.C. Sept. 5, 2019) (internal quotation marks omitted).  To

argue that a prolonged deprivation of liberty, in a crumbling facility with a death rate three times

the national average, is not an irreparable harm flies in the face of the law and the facts.

**IV.     The balance of equities and public interest favor Plaintiffs.**

 As an initial matter, Defendants inexplicably assert that the government is irreparably

harmed when an injunction runs against *nonparties*.  Opp. at 44 (citing *Trump v. CASA, Inc.*, No.

24A884, 2025 WL 1773631, at *14 (U.S. June 27, 2025)).  But this case is a class action, and

*CASA* is very clear that its holding does not touch on the proper scope of injunctions in the class

context.    2025  WL  1773631,  at  *10.    Nor  do  Defendants  truly  contest  provisional  class

certification.  They merely plan to explain their opposition to final certification in a later filing,

conceding the issue for purposes of the present motion.  Opp. at 44 n.7; *Al-Tamimi v. Adelson*, 916

F.3d 1, 6 (D.C. Cir. 2019) (a party who merely "[m]ention[s] an argument" in a "skeletal way"
forfeits it (internal quotation marks omitted)).

The equities and public interest—here merged—cut decisively in Plaintiffs' favor.  An
injunction would benefit the public interest by promoting government compliance with statutory
and constitutional law. *Widakuswara v. Lake*, No. 1:25-cv-1015, __ F. Supp. 3d __, 2025 WL
1166400, at *17 (D.D.C. Apr. 22, 2025) (noting substantial public interest in ensuring "compliance
with governing statutes and the Constitution"), *appeal docketed*, No. 25-5144 (D.C. Cir. Apr. 24,
2025).  Such compliance is particularly weighty in the equitable balance when rights concerning
health and bodily liberty are at stake.  Defendants' concern that they would have to release more
individuals than the injunction calls for to demonstrate compliance is baseless.  Such self-imposed
harm is no reason to deny a properly tailored injunction.[13]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court provisionally
certify the class and issue a preliminary injunction effectuating Mr. Hagans' and putative class
members' release or, in the alternative, requiring that Defendants make individualized
determinations at a hearing about whether pre-revocation detention is necessary and appropriate.

---

[13] Bond is inappropriate in this civil rights case.  District courts have "broad discretion" as to the
"appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir.
1999), which includes "the discretion to require no bond at all."  *Simms v. D.C.*, 872 F. Supp. 2d
90, 107 (D.D.C. 2012).  "Exercising that discretion, federal courts typically require substantial
bonds only in suits between private parties with significant monetary interests at stake." *League
of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-cv-0946, __ F. Supp. 3d __,
2025 WL 1187730, at *61 (D.D.C. Apr. 24, 2025) (collecting cases); *see also Crowley v. Loc. No.
82*, 679 F.2d 978, 1000 (1st Cir. 1982) (explaining that while bonds may be appropriate in cases
"involv[ing] commercial or financial transactions," "no bond is required" in suits to "enforce
important federal rights or 'public interest'"), *rev'd on other grounds*, 467 U.S. 526 (1984).

Dated: July 8, 2025
       Washington, D.C.

*/s/ Elizabeth Henthorne*

Elizabeth Henthorne (D.C. Bar No. 1562688)
Maura E. Smyles (D.C. Bar No. 90006775)
Ruby Giaquinto (D.C. Bar No. 90011104)
Jenner & Block LLP
1099 New York Ave. N.W.
Suite 900
Washington, D.C. 20001
Tel. (202) 639-6000
Fax (202) 639-6066
BHenthorne@jenner.com
MSmyles@jenner.com
RGiaquinto@jenner.com

Hanna Perry (D.C. Bar No. 90003756)
Zoé Friedland (D.C. Bar No. 1781910)
Public Defender Service for the District of Columbia
633 3rd St. N.W.
Washington, D.C. 20001
Tel. 202-824-2198
Fax 202-824-2093
hperry@pdsdc.org
zfriedland@pdsdc.org